OZIA BREWINGTON, Plaintiff-Appellant, v. THE ILLINOIS DEPART-
MENT OF CORRECTIONS *et al.*, Defendants-Appellees.—THE ILLINOIS
DEPARTMENT OF CORRECTIONS, Plaintiff-Appellant, v. OZIA BREW-
INGTON *et al.*, Defendants-Appellees.

First District (3rd Division) Nos. 85—1329, 85—1617 cons.

Opinion filed September 9, 1987.—Rehearing denied October 16, 1987.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, of Chicago, of counsel), for appellee Human Rights Commission.

Gary H. Palm, of Chicago, for Ozia Brewington.

Frederick R. Baird II, of Chicago, for Department of Corrections.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff Ozia Brewington appeals from a judgment of the circuit court of Cook County which affirmed the final administrative decision of the defendant Illinois Human Rights Commission (Commission) finding that she was not entitled to back pay and reinstatement to her former position with the defendant Illinois Department of Corrections (DOC). The DOC appeals from the same judgment's affirmance of the Commission's findings that it had discriminated against plaintiff on the basis of sex and that she was entitled to an award of $12,699.16 in reasonable attorney fees from the DOC.

Plaintiff began working for the DOC in 1970. In October 1977, the DOC transferred her to its Chicago Residential Center (CRC) as a youth supervisor II and assigned her to the 4 p.m. to 12 a.m. shift. Under the contract between the State and plaintiff's union, the American Federation of State, County and Municipal Employees (AFSCME), employees selected their work shifts on the basis of seniority. However, a supplementary agreement limited to one each the number of women who could work the 8 a.m. to 4 p.m. and 12 a.m. to 8 a.m. shifts at the CRC for security purposes. Plaintiff first complained of this policy in October 1977 and made an oral grievance of it on October 17, 1977, to the CRC chief of security. She alleged, and the administrative law judge (ALJ) who heard the matter found, that she had made at least two oral requests of her supervisor, Sam Haggins, to be transferred from the 4 p.m. to 12 a.m. shift in the first quarter of 1979. She also alleged that she informed him she needed the change because her son was having problems and required additional supervision in the evenings. She was still on the 4 p.m. to 12 a.m. shift on March 16, 1979, when a new male white employee was assigned to the 8 a.m. to 4 p.m. shift. Plaintiff resigned on April 2, 1979.

On July 23, 1979, plaintiff filed a discrimination complaint with the Illinois Fair Employment Practices Commission (FEPC). She alleged sexual and racial discrimination in that she had been denied a shift change while a newly hired white male was assigned to the 8 a.m. to 4 p.m. shift, one of the shifts to which she had requested a transfer. Having found substantial evidence of an unfair employment practice, the FEPC issued a complaint against the DOC alleging sexual discrimination against plaintiff in denying her a shift change while allowing similarly situated males to change shifts. Plaintiff filed her amended complaint of unfair employment practices against the DOC before the Commission on July 22, 1980. All proceedings were thereafter conducted under the provisions of the Illinois Human Rights

Act, which became effective on July 1, 1980. Ill. Rev. Stat., 1980 Supp., ch. 68, par. 1—101 *et seq.*

The ALJ who heard the matter found, *inter alia,* that plaintiff's work environment was not so intolerable as to compel a reasonable person to resign and concluded that, although the DOC had discriminated against her by refusing to process her request for a shift change, it had not constructively discharged her. He therefore recommended that the Commission not award plaintiff reinstatement or back pay. However, he did recommend that: (1) plaintiff's complaint be sustained; (2) the DOC clear from its personnel records all references to plaintiff's complaint; (3) the DOC be ordered to cease and desist from discriminating on the basis of sex and race with respect to its shift selection policy; (4) the DOC pay plaintiff reasonable attorney fees and costs to the extent that plaintiff had prevailed. The Commission affirmed and adopted the recommendations in its order of November 3, 1982. Subsequently, plaintiff filed her petition for $15,076.88 in attorney fees. She sought payment of 49.5 hours expended by two attorneys at a rate of $100 per hour and 428.5 hours expended by three senior law students at a rate of $25 per hour. The ALJ found that the time expended by the law students included 40 hours of duplicative efforts. He reduced plaintiff's fee request by 10% because she had not obtained some of the requested relief. He also concluded that senior law students practicing on a temporary license under Supreme Court Rule 711 (87 Ill. 2d R. 711) are entitled to compensation when they represent prevailing complainants before the Commission. He therefore recommended that plaintiff be awarded $12,669.19 as reasonable attorney fees. The Commission affirmed and adopted the recommendation in its order of May 17, 1984.

Both parties sought administrative review of these orders in the circuit court. The trial court affirmed them as not against the manifest weight of the evidence or contrary to law. Each party appeals from the unfavorable portion of that judgment.

■ Plaintiff contends on appeal that the trial court erred in applying the wrong test to determine whether she had been constructively discharged by the DOC so as to entitle her to an award of back pay and reinstatement. She contends the court incorrectly required her to prove that defendant intended to force her to resign rather than merely requiring her to prove that a reasonable person in her "shoes" would have felt compelled to resign. She concludes she met the applicable standard and was thus entitled to back pay and reinstatement. The Commission responds that it did not require proof of a discriminatory intent by the DOC, but denied the contested relief be-

cause plaintiff failed to prove her working conditions were so unpleasant that she had no reasonable alternative to resignation.

In dealing with the allocation of burdens of proof and persuasion in employment discrimination cases, Illinois courts have turned to cases applying the Federal Civil Rights Act (42 U.S.C. sec. 2000e (1982)). (*Burnham City Hospital v. Human Rights Com.* (1984), 126 Ill. App. 3d 999, 1002, 467 N.E.2d 635.) The Federal cases proceed on theories of disparate treatment, which requires proof of discriminatory motive, or disparate impact, which involves employment practices falling more heavily on minority groups without justified business necessity. 126 Ill. App. 3d 999, 1002, 467 N.E.2d 635.

The ALJ held that plaintiff had established a *prima facie* case of disparate treatment where she: (1) was a member of the group protected by the Fair Employment Practices Act (Ill. Rev. Stat. 1979, ch. 48, par. 851 *et seq.*); (2) was treated in a particular manner by her employer; and (3) was treated differently than similarly situated white male employees, citing, *inter alia, Chicago-Allis Manufacturing Corp. v. Fair Employment Practices Com.* (1975), 32 Ill. App. 3d 392, 336 N.E.2d 40. As such, the ALJ also found the burden shifted to the DOC to articulate a legitimate nondiscriminatory reason for its failure to process plaintiff's request for a shift change. (*A. P. Green Services Division v. Fair Employment Practices Com.* (1974), 19 Ill. App. 3d 875, 880-81, 312 N.E.2d 314.) Because defendant claimed that plaintiff did not request a shift change, the ALJ found the burden shifted back to plaintiff to show that the articulated reason was a pretext for discrimination. (19 Ill. App. 3d 875, 881, 312 N.E.2d 314.) He found that plaintiff met the burden by proving she had requested a transfer. He also found that the supplementary agreement between the DOC and AFSCME discriminated against women on its face in restricting the shifts which they could work and thus revealed that the DOC's articulated reason for denying plaintiff a shift change was pretextual. However, the ALJ rejected plaintiff's argument that the DOC had constructively discharged her. The Commission affirmed and adopted the ALJ's recommended order and decision.

The applicable test is whether " '*the working conditions* would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " (Emphasis added.) (*Bourque v. Powell Electric Manufacturing Co.* (5th Cir. 1980), 617 F.2d 61, 65, quoting *Rosado v. Santiago* (1st Cir. 1977), 562 F.2d 114, 119.) In asserting that the proper test is whether "a reasonable person in plaintiff's shoes would have felt compelled to resign," plaintiff ignores the first part of the test. That is, the employee must

be compelled to resign by her working conditions, not some cause unrelated and merely coincidental to them. Thus, the applicable test has two prongs: (1) difficult or unpleasant working conditions; and (2) a compulsion to resign in a reasonable person caused by those conditions.

 We believe the ALJ and the Commission properly applied this test and did not require plaintiff to prove that the DOC intended, by its discriminatory practice, to force her to resign. Rather, they found that the DOC had not constructively discharged her because she failed to prove the first prong of the *Bourque* test, *i.e.*, that she was compelled to resign by her working conditions. This conclusion is borne out by a reading of the recommended order and decision of the ALJ and the order and decision of the Commission.

The ALJ's order and decision stated in pertinent part:

"[T]o prove a constructive discharge, a complainant must demonstrate that her work environment was one that would foreseeably result in an ordinary individual's resignation. (*Hill and Interlake, Incorporated* 1 Ill. F.E.P. Rep. 32, 35 (FEPC June 13, 1974). *** [C]omplainant has not demonstrated that such an environment existed for her at respondent. [She] testified that she desired to be home to supervise her son, who was having trouble, when he returned home from school. Although she preferred to work another shift and *** felt that respondent's shift change policy was discriminatory, complainant presented no evidence that the work environment on the shift to which she was assigned was one which foreseeably would result in an ordinary individual's resignation. Complainant produced no evidence that respondent unlawfully forced her to resign."

Thus, the ALJ properly focused on plaintiff's working conditions and did not require proof of the DOC's intent. Moreover, neither his articulation of a standard of foreseeability by the employer nor his conclusion that plaintiff did not show that the DOC "unlawfully forced her to resign" can be read as requiring such proof.

The order and decision of the Commission stated:

"A constructive discharge will be found where working conditions would have been so difficult that a reasonable person in the employee's position would have been compelled to resign. [Citing *Bourque* and *Rosado*.] The employer must deliberately make conditions so intolerable that an employee is forced into an involuntary resignation. *Welch v. University of Texas* 659 F.2d 531 (5th Cir. 1981), *Young v. Southwestern Savings & Loan* 509 F.2d 140 (5th Cir. 1975).

This is not the case here as the findings of fact clearly indicate that complainant's resignation was voluntary and the work environment was not so intolerable to compel resignation." Although the Commission articulated a deliberateness standard by which to measure an employer's conduct, as articulated in *Young*, as well as the *Bourque* standard, the former did not amount to a requirement that plaintiff prove "intent." That the commission's focus properly remained on plaintiff's working conditions and the reasonableness of her resignation is evidenced by its conclusion that her "work environment was not so intolerable to compel her resignation." Moreover, *Bourque* did not equate the "deliberateness" test with one of "intent." After quoting the "deliberateness" language from *Young* and citing *Calcote v. Texas Educational Foundation, Inc.* (5th Cir. 1978), 578 F.2d 95, for the same general proposition, the court stated that in neither case did it examine the facts under the stringent test requiring an employer's intent to rid itself of an employee and that, instead, "analysis proceeded upon an examination of the conditions imposed." (*Bourque v. Powell Electrical Manufacturing Co.* (5th Cir. 1980), 617 F.2d 61, 65.) Similarly here, the Commission's analysis proceeded upon an examination of the plaintiff's working conditions, not the DOC's intent in imposing those conditions on her. We find that the test applied by the Commission and the result reached by it were not contrary to the applicable law.

Plaintiff's cited cases do not compel a contrary conclusion. In each, the court's focus was whether the working conditions imposed on the employee were so intolerable as to compel a reasonable person to resign. Equally as important, none of the cases determined the issue of intolerability by reference to facts or circumstances unrelated to those conditions. See, *e.g.*, *Bourque v. Powell Electrical Manufacturing Co.* (5th Cir. 1980), 617 F. 2061 (working for unequal pay under circumstances presented did not constitute a condition of employment so intolerable as to force employee into involuntary resignation); *Rosado v. Santiago* (1st Cir. 1977), 562 F.2d 114 (before punitive transfer in violation of employee's first amendment rights could be found to be a constructive discharge, trier of fact must have been satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in employee's shoes would have felt compelled to resign); *Lojek v. Thomas* (9th Cir. 1983), 716 F.2d 675 (dissatisfaction with shareholder agreements in professional corporation did not create working conditions so unpleasant that a reasonable person in plaintiff's shoes would have been compelled to resign); *Nolan v. Cleland* (9th Cir. 1982), 686 F.2d 806 (history of unlawful discrimina-

tion may have made plaintiff's position intolerable and raised a genuine issue of material fact whether a reasonable person would have felt compelled to resign under such circumstances); *Clark v. Marsh* (D.C. Cir. 1981), 665 F.2d 1168 (continuous pattern of discriminatory treatment over a period of several years justified a finding of intolerable working conditions driving plaintiff into an involuntary resignation).

The only case cited by plaintiff which is arguably analogous to hers is *McDonald v. United Air Lines, Inc.* (7th Cir. 1978), 587 F.2d 357, *cert. denied* (1979), 442 U.S. 934, 61 L. Ed. 2d 303, 99 S. Ct. 2869. Therein, the court held that stewardesses who involuntarily resigned from their employment with defendant airline because of a prior no-marriage rule had been constructively discharged and thus were includable in a class action against it with those who had been terminated for violating the rule. The court based its ruling on the belief that the position of the stewardesses who voluntarily resigned was indistinguishable from those who were fired since defendant had encouraged them to resign rather than await termination. (587 F.2d 357, 360.) Plaintiff asserts her situation is comparable to that of the stewardesses who resigned rather than be terminated. She argues that, like them, she also resigned because of an implied threat of termination if she were to have violated the DOC's discriminatory work rule. Because she undoubtedly would have been fired had she refused to work the 4 p.m. to 12 a.m. shift, she concludes, her decision to resign was reasonable and amounted to a constructive discharge.

Since the stewardesses in *McDonald* who resigned their positions rather than face termination did so, like plaintiff here, for a reason unrelated to their working conditions, *i.e.*, their decision to marry, *McDonald* seems indistinguishable from this case. However, it is distinguishable. As the ALJ's recommended order and decision noted, plaintiff "presented no evidence of an analogous threat of termination" here. More importantly, the no-marriage rule at issue in *McDonald* attempted to regulate a facet of the employees' lives unrelated to the employment relationship. As such, the stewardesses who resigned were justified in doing so for a reason which itself was unrelated to that relationship. Here, however, the DOC's policy restricting, on the basis of sex, its female employees' right to choose their shifts was not an attempt to regulate a facet of their lives unrelated to the employment relationship. While plaintiff would have been justified in resigning if a reasonable person in her shoes had found the working conditions created by that discriminatory practice intolerable, she was not justified in resigning for a reason unrelated to those working conditions, unlike the stewardesses in *McDonald*.

■■ Moreover, the conclusion that plaintiff's working conditions did not compel her resignation is supported by the manifest weight of the evidence. She testified at the administrative hearing that she wanted a shift change "because of a problem" her son was having and because she "needed to be home in the evenings." She also testified she resigned because of "family problems and commitments" and because her son needed "additional supervision." In a memo to his supervisor, plaintiff's immediate supervisor, Sam Haggins, wrote that plaintiff told him her reason for resigning was "personal" and that she "felt her son needed her." Finally, in response to "Reason for leaving if resignation" on the DOC exit interview form, plaintiff wrote "family commitments." Thus, the evidence reveals plaintiff's resignation was due to her decision that supervising her son was more important than remaining employed and not to her working conditions.

Plaintiff also testified she wanted a shift change because of "problems" with her co-workers on the 4 p.m. to 12 a.m. shift and because of "situations that were being allowed to exist on that shift." On the exit interview form, she responded "no" to the question "[w]ere you satisfied with [w]orking conditions" and "yes" to questions whether she personally experienced any discrimination and whether she had seen any discrimination against clients or employees by co-workers. However, plaintiff does not cite these circumstances as evidence of intolerable working conditions which compelled her, as a reasonable employee, to resign and we do not otherwise find that they make the Commission's decision contrary to the manifest weight of the evidence.

■■ In its cross-appeal, the DOC first contends the Commission abused its discretion in awarding plaintiff $12,699.19 in attorney fees. She responds that the award of attorney fees is supported by the manifest weight of the evidence. Both parties agree that *Hensley v. Eckerhart* (1983), 461 U.S. 424, 76 L. Ed. 2d 40, 103 S. Ct. 1933, supplies the applicable standards to determine the propriety of the award but they disagree as to the results to be reached under it. In the absence of Illinois cases on an issue, we may look to analogous Federal decisions. *Cook County Police & Corrections Merit Board v. Illinois Fair Employment Practices Com.* (1978), 59 Ill. App. 3d 305, 308, 376 N.E.2d 11.

■■ The DOC argues that under *Hensley* and· its progeny, the Commission clearly abused its discretion in awarding plaintiff's attorney fees. It asserts that those cases are in line with the Illinois rule that attorney fees statutes are strictly construed. (*Model Industries,*

*Inc. v. Walsh Press & Die Co.* (1982), 111 Ill. App. 3d 572, 444 N.E.2d 639.) An abuse of discretion occurred, the DOC argues, because plaintiff obtained no relief of pecuniary value and essentially none of the relief which she sought. It further asserts the relief awarded plaintiff in 1984 was moot since the shift change policy at issue was limited to the CRC and ended when it closed that facility in 1981. As such, it concludes, the attorney fee award should be drastically reduced. The DOC asserts that this result would be consistent with the Supreme Court's statement in *Hensley* that, where a plaintiff has lost on the major issue of reinstatement, a limited fee should be awarded in light of the minor relief obtained. (*Hensley v. Eckerhart* (1983), 461 U.S. 424, 439 n.14, 76 L.Ed. 2d 40, 54 n.14, 103 S. Ct. 1933, 1942 n.14.) It also notes that where (1) a defendant is bound to a discriminatory practice by a contract which it could not unilaterally amend; (2) a plaintiff brings a lawsuit only on her behalf; and (3) the litigation has no effect on the termination of the illegal practice, the plaintiff is not entitled to an award of attorney fees because she derives no benefit from the litigation. *Chastang v. Flynn & Emrich Co.* (4th Cir. 1976), 541 F.2d 1040, 1045.

Finally, the DOC contends the Commission abused its discretion in awarding plaintiff attorney fees which included 388.45 hours worked by senior law students. It argues, citing Peacock v. Lane (N.D. Ill. Sept. 6, 1985), No. 82—C—2413, that where litigation serves to train senior law students and could have been handled by one attorney because it was not complicated and did not involve unusual legal principles, the law students' fee rate and billable hours should be drastically cut. It asserts that because of the uncomplicated nature of this case, the expenditure of 428.45 hours by senior law students "clearly indicates the duplicative and unproductive" nature of those hours. Alternatively, it asserts that the Mandel Legal Aid Clinic, which would receive the fee award, would realize a windfall if it is compensated for any of the time expended by the senior law students. It relies on the absence of any evidence that plaintiff, her attorneys or the legal aid clinic compensated the students. The DOC concludes that, under the rule in Federal cases that fee awards in civil rights cases should not result in a windfall to the attorneys and under the Illinois rule that fee-shifting statutes are strictly construed, plaintiff is not entitled to an award including any time expended by the law students.

*Hensley* involved the Civil Rights Attorney's Fees Awards Act of 1976 (42 U.S.C. sec. 1988 (1976)), which allows courts to award reasonable attorney fees to prevailing parties in Federal civil rights actions. The issue before the Supreme Court was whether a plaintiff

prevailing only on some claims could recover attorney fees for legal services on unsuccessful claims. The court first noted that " 'plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit [they] sought in bringing suit' "; once a plaintiff has met this statutory threshold, a court must "determine what fee is reasonable." (*Hensley v. Eckerhart* (1983), 461 U.S. 424, 433, 76 L. Ed. 2d 40, 50, 103 S. Ct. 1933, 1939.) The court observed that "[t]he most useful starting point for determining *** a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" and that a court should "exclude from this initial fee calculation hours *** not 'reasonably expended' " such as "hours that are excessive, redundant, or otherwise unnecessary." (461 U.S. 424, 433-34, 76 L. Ed. 2d 40, 50-51, 103 S. Ct. 1933, 1939-40.) Ultimately, the court held, in pertinent part:

"[T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. sec. 1988 ***. *** Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the *** court did not adopt each contention raised. But where the plaintiff achieved only limited success, the *** court should award only that amount of fees that is reasonable in relation to the results obtained." 461 U.S. 424, 440, 76 L. Ed. 2d 40, 54-55, 103 S. Ct. 1933, 1943.

Here, the ALJ reduced the fee award to reflect the finding that the time expended by the law students included 40 hours of duplicative work. He also reduced the fee award because plaintiff had not prevailed with respect to her claims for back pay and reinstatement. The ALJ reasoned that the gravamen of the Human Rights Act is to prevent discrimination, not to award money judgments, and he noted that plaintiff prevailed with respect to the discrimination issues. Consequently, he concluded the fee award should be reduced by only 10%. The Commission affirmed and adopted the ALJ's recommended order and decision.

In passing on the ALJ's recommendation, the Commission measured the amount of the fee involved against the result obtained, as required under *Hensley*: (461 U.S. 424, 437, 76 L. Ed. 2d 40, 53, 103 S. Ct. 1933, 1941.) It reviewed the purposes behind the Illinois Human Rights Act's attorney fees provision, section 8—108(G) (Ill. Rev. Stat., 1980 Supp., ch. 68, par. 8—108(G)), and 42 U.S.C. sec. 1988 (1976), which was at issue in *Hensley*. It concluded that the purpose

behind the two statutes was the same, *i.e.*, to encourage the bringing of civil rights actions by providing, as part of the relief awarded, payment of the costs of maintaining the action, including attorney fees. It reasoned that plaintiff's action was "instrumental in changing a system-wide institutional policy of discrimination against women" and that it was "precisely the kind of action which the attorney's fee provision of the Human Rights Act was intended to promote." It concluded that, while plaintiff had not received "a great deal of monetary relief," the cease and desist order which resulted from her action was "a major vindication of the anti-discrimination policy of the Human Rights Act." After citing *Hensley*, it concluded that, "in view of the importance of the relief obtained," the ALJ's recommendation was not an abuse of discretion either under that case or any of its own precedent. Importantly, the Commission believed the DOC's arguments ignored "the explicit recognition by the drafters of fee provisions in civil rights laws that in some cases the vindication of civil rights will not produce a large pecuniary award and the intent that attorney's fee awards not be reduced because the rights involved are non-pecuniary in nature."

Lastly, the Commission rejected the DOC's challenge to the hourly rate which the ALJ found reasonable for the law students' time, *i.e.*, $25 an hour. It stated:

> "Once again, the [DOC] has ignored the essential purpose and rationale for attorney's fees awards in Human Rights cases. The aim of this proceeding is to determine the value of the legal services rendered to Complainant in the open market. It is to be hoped that if attorneys who represent Complainants *** in front of the *** Commission are paid the going market rate, then agrieved [*sic*] parties will have no trouble finding competent counsels [*sic*] to represent them ***. ***
>
> The use of law students to handle cases in front of this Commission is consistent with Section 8—108(G) of the Act. The Complainant receives competent legal services at a rate well below the standard market rate for fully licensed attorneys in this area. *** [T]he rate of $25 per hour for the legal services rendered by the law students *** is not against the manifest weight of the evidence."

This review of the Commission's rationale reveals a proper exercise of the discretion vested in it under *Hensley*. Plaintiff's case is the type which, as described in *Hensley*, involves claims for relief based on "a common core of facts or *** related legal theories," as opposed to the type involving "distinctly different claims for relief *** based

on different facts and legal theories." In such a case, much of counsel's time is "devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." (*Hensley v. Eckerhart* (1983), 461 U.S. 424, 434-35, 76 L. Ed. 2d 40, 51, 103 S. Ct. 1933, 1940.) This is readily apparent here, where plaintiff's claim of discrimination with respect to a shift change at the CRC was the predicate for the claim that she had been constructively discharged. If plaintiff had not proven the former, she could not have attempted to prove the latter.

Thus, the Commission properly followed *Hensley's* direction to "focus on the significance of the overall relief obtained *** in relation to the hours reasonably expended on the litigation" in such a case. (461 U.S. 424, 435, 76 L. Ed. 2d 40, 51-52, 103 S. Ct. 1933, 1940.) Given the Commission's recognition of the purposes behind the Illinois Human Rights Act's attorney fees provision, we cannot say that it abused its discretion in concluding that plaintiff had obtained excellent results and was thus entitled to a fully compensatory attorney fee. (461 U.S. 424, 435, 76 L. Ed. 2d 40, 52, 103 S. Ct. 1933, 1940.) *Hensley* also notes that where a plaintiff has obtained such results, his attorney fee award "[n]ormally *** will encompass all hours reasonably expended on the litigation" and "should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." 461 U.S. 424, 435, 76 L. Ed. 2d 40, 52, 103 S. Ct. 1933, 1940.

Here, plaintiff did not prevail on her contention that she had been constructively discharged and thus lost her claim for back pay and reinstatement. She did, however, prevail on her contention that the DOC discriminated against women in general and against her in particular and won, *inter alia*, a cease and desist order prohibiting further discrimination against women in its shift change policy. Under *Hensley*, it is not "necessarily significant that a prevailing plaintiff did not receive all the relief requested" and injunctive relief alone may entitle a plaintiff to "a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time." (461 U.S. 424, 436 n.11, 76 L. Ed. 2d 40, 52 n.11, 103 S. Ct. 1933, 1940-41 n.11.) As such, we believe the cease and desist order entered against the DOC as a result of plaintiff's complaint alone justifies the fee awarded plaintiff. We cannot say that the relief won by plaintiff, although significant, is limited in comparison to the scope of the litigation as a whole and that, therefore, a reduced fee award is appropriate. (461 U.S. 424, 440, 76 L. Ed. 2d 40, 54, 103 S. Ct. 1933, 1943.) Rather, given the public policies behind the now repealed Fair

Employment Practices Act (Ill. Rev. Stat. 1979, ch. 48, par. 851) and the Illinois Human Rights Act (Ill. Rev. Stat. 1981, ch. 68, par. 1—102), we agree with the Commission that the results plaintiff obtained were excellent, if not for her, at least for all women employed by the DOC. In such a case, *Hensley* directs the allowance of a fully compensatory fee award. As such, the fee award was not unreasonable and the Commission properly exercised its discretion.

■■ Even if we disagreed with the Commission that plaintiff obtained excellent results and were to conclude that she achieved only partial or limited success, we would not conclude that it abused its discretion in affirming the ALJ's fee award. In reducing the law students' time because of duplicative efforts and the total fee requested because plaintiff had not completely succeeded, the ALJ properly exercised his discretion under *Hensley*. The court stated that in deciding upon the fee to which a prevailing plaintiff was entitled a court may, in its discretion, "attempt to identify specific hours that should be eliminated, or *** simply reduce the award to account for the limited success" the plaintiff achieved. (*Hensley v. Eckerhart* (1983), 461 U.S. 424, 436-37, 76 L. Ed. 3d 40, 52, 103 S. Ct. 1933, 1941.) As he also was fully cognizant of the purposes and public policy behind the Illinois Human Rights Act, we cannot say that the fee award recommended, based on the conclusion that "the gravamen of the Act is to prevent discrimination, not to award money judgments" was an abuse of that discretion.

The DOC's remaining arguments do not compel a contrary conclusion. Preliminarily, we disagree that *Hensley* requires a limited fee award where a plaintiff loses claims for back pay and reinstatement because the relief otherwise obtained is "minor." This argument is based on the discussion in *Hensley* of the case on which the district court relied in awarding the fee at issue there. In that case, *Brown v. Bathke* (8th Cir. 1978), 588 F.2d 634, a schoolteacher sought reinstatement, lost wages, damages and expungement of derogatory material from her employment record. She won only lost wages and expungement. The district court had awarded fees for the time plaintiff's attorney spent on the legal issues on which it granted relief. The appellate court reversed on the ground that, while the results obtained could be considered, they should not " 'be given such weight that it reduces the fee awarded *** below the "reasonable attorney's fee" authorized by the Act.' " (*Hensley v. Eckerhart* (1983), 461 U.S. 424, 439 n.14, 76 L. Ed. 2d 40, 54 n.14, 103 S. Ct. 1933, 1942 n.14.) The court observed:

"Our holding today differs at least in emphasis from that of

the Eighth Circuit ***. *** In *Brown* the plaintiff had lost on the major issue of reinstatement. The District Court found that she had ' "obtained only a minor part of the relief she sought." ' [Citation.] In remanding the Eighth Circuit implied that the District Court should not withhold fees for work on unsuccessful claims unless [they] were frivolous. Today we hold otherwise. It certainly was well within the *Brown* District Court's discretion to make a limited fee award in light of the 'minor' relief obtained." 461 U.S. 424, 439 n.14, 76 L. Ed. 2d 40, 54 n.14, 103 S. Ct. 1933, 1942 n.14.

Properly read, these observations merely reaffirm the court's conclusion that where a plaintiff achieves only limited success, a court may, in its discretion, eliminate specific hours or reduce the fee award to reflect that success. They do not amount to a holding that, where a plaintiff has lost on the major issue of reinstatement, a limited fee "should," *i.e.*, must, be awarded in view of the "minor" relief granted. Moreover, giving them such effect would denigrate the purpose and public policies behind the Illinois Human Rights Act. The protection of civil rights in general is as worthy a goal to be served by a proceeding under the Act as is the vindication of one particular individual's civil rights. In this regard, we note there is no indication in *Hensley* that the *Brown* court granted any relief akin to the cease and desist order entered here.

*Chastang v. Flynn & Emrich* (4th Cir. 1976), 541 F.2d 1040, on which the DOC also relies, is factually inapposite. Therein, male employees alleged that a profit-sharing and retirement benefits plan was sexually discriminatory. Although the court found that the plan illegally discriminated against male employees, it denied plaintiffs an award of attorney fees because special circumstances rendered the award unjust. (541 F.2d 1040, 1045.) Those circumstances were: (1) the plan was originated at a time when it was not illegal; (2) the defendant employer did not have an unrestricted right to amend the plan but could do so only with the concurrence of the committee which administered it; (3) the plan was amended to eliminate the sex discrimination before the plaintiffs filed suit on their behalves only; (4) the defendant employer had no financial interest in the plan and, thus, no incentive to discriminate. (541 F.2d 1040, 1045.) The court concluded that a fee award would punish "innocent participants in the plan" and that the plaintiffs derived no benefit, direct or indirect, from the litigation since the plan was amended prior to their bringing suit. 541 F.2d 1040, 1045.

The most important differences between this case and *Chastang*

are: (1) it cannot be said the DOC's policy of denying women the same right it gave men to choose their work shift was not illegal when it originated; (2) no innocent third parties would be penalized by an award of fees; (3) the DOC's policy was not amended to eliminate the sex discrimination before plaintiff filed her complaint and, thus, (4) it cannot be said that she derived no benefit, direct or indirect, from the litigation. In view of these differences, we do not believe *Chastang* presents the better rule simply because of the similarities between the two cases. While the DOC may have been bound to its discriminatory policy by an agreement with plaintiff's union, it was a departure from the general policy allowing female employees the same right as male employees to exercise their seniority in shift selection. Moreover, that this discriminatory policy may have been limited to the CRC, and, thus, ceased when the DOC closed it in 1981, does not vitiate the future benefits of plaintiff's action to female State employees. We reject the suggestion that *Chastang* compels a finding that the administrative agencies and courts of this State abuse their discretion whenever they award attorney fees in similar circumstances. *Chastang* is not binding authority and we decline to give it such effect.

We also decline to follow Peacock v. Lane (N.D. Ill. Sept. 6, 1985), No. 82—C—2413, cited by the DOC chiefly for the proposition that attorneys or law students being trained as part of a litigated case should not receive the full amount of fees sought. In Peacock, civil rights plaintiff's attorneys sought fees at their firm's commercial rates. The court decided that plaintiff's recovery of only $5,000 against only one of five defendants required a substantial reduction of fees under *Busche v. Burkee* (7th Cir. 1981), 649 F.2d 509, and that the fee sought was unreasonable under *Waters v. Wisconsin Steel Works* (7th Cir. 1974), 502 F.2d 1309. It reduced by half the rate sought because "the principal attorneys were being trained" and the time sought to be compensated "to eliminate the duplication of time which was apparent on every occasion when this case was in court and presumably continued throughout the preparation for trial." Finally, it noted, citing *Hensley*, that "plaintiff's counsel should have adjusted their expenditure of time to relate more accurately to the expectable recovery, as they would certainly have been required to do by a private client." Peacock v. Lane (N.D. Ill. Sept. 6, 1985), No. 82—C—2413, slip op. at 4, 6.

We view Peacock v. Lane as nothing more than an exercise of the sound discretion vested in every trial court. While the plaintiff therein recovered only a $5,000 judgment, plaintiff Brewington ob-

tained a cease and desist order prohibiting defendant from continuing its discriminatory policy. Since, as previously noted, under *Hensley*, injunctive relief alone can support a fully compensatory fee, the cease and desist order entered here amply supports the fee awarded if the relief obtained justifies that expenditure of attorney time. (*Hensley v. Eckerhart* (1983), 461 U.S. 424, 436 n.11, 76 L. Ed. 2d 40, 52 n.11, 103 S. Ct. 1933, 1941 n.11.) The court in Peacock believed the rate sought should be reduced because the plaintiff's attorneys were being trained. The ALJ in this case believed senior law students practicing before the Commission "in general" and the one who represented plaintiff "in particular" do as well representing complainants as the majority of the licensed attorneys appearing before the Commission. This difference of opinion between the Commission and the Peacock court does not require a finding of an abuse of discretion. Moreover, the Commission's finding of only 40 hours of duplication in the law students' work does not require a finding of an abuse of discretion merely because the Peacock court reduced the time factor by half because of duplication. Finally, we refuse to measure the fee sought by the "expectable" pecuniary recovery in this case. We agree with the Commission that the gravamen of the Human Rights Act is to prevent discrimination, not to award money judgments. To measure fee awards in such cases by the pecuniary recovery would defeat the purpose of the Act and we decline to do so.

██ █ Finally, we do not believe that the rule in Federal cases prohibiting windfalls to attorneys through fee awards (*Hensley v. Eckerhart* (1983), 461 U.S. 424, 430 n.4, 76 L. Ed. 2d 40, 48 n.4, 103 S. Ct. 1933, 1938 n.4) and the Illinois rule requiring strict construction of statutory fee-shifting provisions (*Model Industries, Inc. v. Walsh Press & Die Co.* (1982), 111 Ill. App. 3d 572, 444 N.E.2d 639) require a finding that the compensation of the senior law students' time was an abuse of discretion because the Mandel Legal Aid Clinic, which will receive the award, did not itself compensate them. That an attorney does not exact a fee or has agreed that the organization employing him will receive any attorney fees awarded is not grounds on which to deny or reduce the fee. (*Merchandise National Bank v. Scanlon* (1980), 86 Ill. App. 3d 719, 728-29, quoting *Fairley v. Patterson* (5th Cir. 1974), 493 F.2d 598, 606-07.) An award of fees for the time expended by the uncompensated law students in this case is also supported by the reasoning of the court in *Jordan v. United States Department of Justice* (D.C. Cir. 1982), 691 F.2d 514, 523-24, an action brought under the attorney fee provision

(5 U.S.C. sec. 552(a)(4)(F) (1976)) of the Freedom of Information Act (5 U.S.C. sec. 552 (1976 & Supp. IV 1980)):

"The Department further contends that a fee award cannot appropriately extend to law-student work because the students *** have not received any compensation. Restated, the notion *** seems to be that even if fees attributable to law-student work are theoretically acceptable, any award therefor should be zero because the students are unpaid. That thesis unmistakeably is foreclosed by [the] direction that fee allowances are basically to be measured by the market value of the services rendered not the amount actually received by the attorney nor the amount that would have been received absent an award of fees. This holding was grounded in part on realization that public-interest attorneys often charge their clients a smaller or even nominal sum gauged by ability to pay rather than service value, and recognition that policy considerations dictate that the awarded fees instead be calibrated to true market value. *** Fees for student legal work, if otherwise properly allowable, should represent the market value of their services, not the sum the client may pay to the clinic ***, nor the amount the clinic may pay to the students ***." (691 F.2d 514, 523-24.)

We believe *Jordan* represents the better-reasoned rule to be applied in the area of civil rights litigation and hereby adopt it as the rule of decision on this issue.

■ Lastly, the DOC contests the Commission's finding that it discriminated against plaintiff as against the manifest weight of the evidence. Specifically, it asserts plaintiff never requested a shift change and therefore was not adversely affected by its shift change policy. It maintains that plaintiff's evidence of such a request, *i.e.*, her and a co-worker's testimony, was "flimsy," "contradictory" and "thoroughly rebutted."

An administrative agency's findings of fact are *prima facie* true and correct and cannot be reversed unless they are against the manifest weight of the evidence, *i.e.*, unless the opposite conclusion is clearly evident from the record. (*Brown v. Sexner* (1980), 85 Ill. App. 3d 139, 146-47, 405 N.E.2d 1082.) Moreover, if the issue before the agency turns on conflicting testimony and the credibility of witnesses, its determination should be sustained. *Keen v. Police Board* (1979), 73 Ill. App. 3d 65, 70-71, 391 N.E.2d 190.

Plaintiff testified she orally requested a transfer of her immediate supervisor, Sam Haggins, several times in late 1978 and early

1979. She stated that a co-worker, Althea Brown, had overheard one of the requests in February 1979. She also claimed to have met with the CRC program director, Robert Guthrie, in early 1979 and the CRC chief of security, Arthur Clay, in March 1979 concerning her transfer request. Althea Brown testified she overheard plaintiff ask Haggins for a transfer once in February 1979 and once in March 1979. Haggins, Guthrie and Clay denied plaintiff requested a transfer.

That plaintiff and Brown differed as to how may requests Brown overheard and that Haggins never saw them together in February 1979 does not compel a finding that plaintiff did not request a transfer. Plaintiff and Brown agreed that Brown heard plaintiff make at least one transfer request. Thus, their testimony was, at least, partly corroborative and sufficient for the Commission's finding. Similarly, that Haggins never saw plaintiff and Brown together fails to prove that Brown did not hear a conversation between him and plaintiff.

We conclude that a finding that plaintiff did not request a shift transfer is not clearly evident from the record. As such, we affirm the Commission's finding that the DOC discriminated against plaintiff by denying that request on the basis of her sex as not against the manifest weight of the evidence.

For all of the foregoing reasons, the judgment of the circuit court of Cook County affirming the final administrative decision of the Illinois Human Rights Commission is affirmed in its entirety.

Affirmed.

McNAMARA, P.J., and WHITE, J., concur.