Barbara PROPST and Franklin M. Propst, Plaintiffs–Appellants,

v.

Donald L. BITZER, Morton W. Weir, Judith S. Liebman, and Robert M. Berdahl, Defendants–Appellees.

Nos. 93–3825, 93–3826.

United States Court of Appeals, Seventh Circuit.

Argued May 13, 1994.

Decided Nov. 1, 1994.

Robert Kirchner (argued), Lerner & Kirchner, Champaign, IL, for plaintiff-appellant.

Edward L. Adelman, John W. Leskera (argued), Dunham, Boman & Leskera, East St. Louis, IL, for Donald L. Bitzer.

James C. Kearns, Bradford J. Peterson, Fred K. Heinrich, Heyl, Royster, Voelker & Allen, Urbana, IL, for Morton W. Weir.

Arnold F. Blockman, Hatch, Blockman, McPheters & Lyke, Champaign, IL, for Judith S. Liebman.

Michael M. Conway (argued), Michael Mishlove, Hopkins & Sutter, Chicago, IL, for Robert M. Berdahl.

Arthur M. Lerner, Robert Kirchner (argued), Lerner & Kirchner, Champaign, IL, for Franklin M. Propst.

Before CUDAHY, KANNE, and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.

Barbara Propst, former Assistant Director of the Computer-based Education and Research Laboratory ("CERL") at the University of Illinois at Urbana–Champaign,[1] and her husband Franklin M. Propst, former Associate Director of CERL, sued the Laboratory's Director, Donald L. Bitzer, and three university administrators. The Propsts contended that they had been transferred from their positions at CERL in retaliation for exposing Bitzer's misappropriation of university funds, in violation of the First Amendment and state law. The Propsts now appeal several of the District Court's rulings that together resulted in the dismissal of all of their claims, and we affirm.

I.

As Associate Director of CERL, Franklin's responsibilities had been primarily administrative, such as overseeing the Laboratory's finances and negotiating personnel contracts. A physicist by training, Franklin also worked closely with Director Bitzer in setting the Laboratory's research goals. As Assistant

---

1. Although commonly referred to as "Champaign–Urbana," the campus' official title locates it at "Urbana–Champaign."

Director, Barbara Propst managed the Laboratory's business office. Franklin was Barbara's immediate supervisor, and both Propsts reported to Bitzer. The three university administrators named in the Propsts' suit included Morton W. Weir, who became Chancellor of the University on August 21, 1987 and was the chief administrative officer of the Urbana campus at the time of the Propsts' transfer. Weir coordinated the work of four Vice–Chancellors, including Vice–Chancellor of Research Judith S. Liebman and Vice–Chancellor for Academic Affairs Robert M. Berdahl, who were also named as defendants. Weir, Liebman and Berdahl together comprised a committee that oversaw all university departments and research units and was authorized to make personnel changes in order to ensure effective functioning.

In late 1986 or early 1987, the Propsts began questioning several aspects of CERL's business operations. The Propsts alleged to university officials that Bitzer had diverted university resources to benefit himself and private companies that he controlled, and that he had failed to document various expenditures as required under university regulations. During the same period, Bitzer complained to Liebman about difficulties he was experiencing in working with the Propsts. Bitzer told Liebman that the mistrust between himself and Franklin seemed unremediable, and that he doubted the three could continue working together effectively. In response, Liebman suggested that Bitzer consider removing the Propsts from their positions. In late January or early February 1987, however, Liebman, Berdahl and then-Chancellor Thomas Everhart decided that it would be inadvisable to transfer the Propsts without first investigating their allegations. An informal investigation by Associate Vice–Chancellor Jane Loeb was initiated but then discontinued in favor of a formal audit by the Office of University Audits.

The audit, which relied on interviews of CERL employees and other data from the Laboratory, began in March 1987 and lasted for six months. In an October 27, 1987 letter to Weir, Bitzer complained that the auditors' inquiry into his business practices was highly intrusive and that the auditors were treating him with impertinence. He contended that the investigation was wholly unwarranted and threatened to resign if the disruption caused by the Propsts' allegations was not brought to a rapid conclusion. (Plaintiffs' Ex. 7B.) The auditing department's Assistant Director of Investigations, James E. Moran, also testified that Bitzer had threatened to resign three times during the course of the audit. (Moran Dep. at 159, 190).

After causing considerable disruption at CERL (discussed in detail below), the audit ultimately absolved Bitzer of any wrongdoing. Believing that the Laboratory could not continue to function with the disharmony that had been produced, the administrators removed the Propsts from their posts at CERL in late November 1987. Barbara Propst was assigned to the position of Assistant Dean in the College of Applied Life Sciences, and Franklin Propst was returned to his previous position as a tenured professor of physics. Neither transfer resulted in any loss of compensation or rank, and both Barbara and Franklin received their scheduled salary increases for the 1987–88 academic year.

On November 25, 1987, Franklin sued in federal court under 42 U.S.C. § 1983, alleging that he had been transferred in retaliation for his accusations regarding Bitzer, in violation of the First Amendment. Franklin also alleged that the transfer violated a state law prohibition against retaliatory discharge for exposing misuse of public funds. The district court dismissed his state law claim, and Franklin subsequently filed an amended complaint. The district court denied the defendants' motion for summary judgment based on qualified immunity, and a panel of this court rejected their belated request for leave to file an interlocutory appeal of that decision. *Weir v. Propst*, 915 F.2d 283 (7th Cir.1990).

On October 27, 1989, Barbara sued in state court, alleging that her removal from CERL violated both the First Amendment and state law. After Barbara's suit was removed to federal court, the defendants moved for dismissal of her state law claim and for summary judgment with respect to her First

Amendment claim, again asserting the defense of qualified immunity and relying on the evidence previously developed in Franklin's case. The district court dismissed the state law claims but denied the motion for summary judgment for the same reasons it had articulated in Franklin's case. Upon the timely appeal of that decision this court reversed, finding that Weir, Liebman and Berdahl were entitled to qualified immunity. *Elliott v. Thomas*, 937 F.2d 338, 346 (7th Cir. 1991), *cert. denied,* — U.S. —, —, 112 S.Ct. 973, 1242, 117 L.Ed.2d 138, 475 (1992) ("*Propst I* ").[2]

The administrators then renewed their motion for summary judgment on the basis of qualified immunity against Franklin, and the district court granted it in light of our decision in *Propst I*. The Propsts' First Amendment claims against Bitzer were subsequently consolidated, and Bitzer's renewed motion for summary judgment against both Propsts was granted. Franklin now appeals the district court's grant of summary judgment to Weir, Liebman and Berdahl, and both Propsts challenge the court's grant of summary judgment to Bitzer as well as its dismissal of their state law claims.

## II.

### A. *Wier, Liebman and Berdahl*

■ There is very little question that the district court was correct to reverse itself on the administrators' entitlement to qualified immunity in Franklin's case following our decision in *Propst I*, which addressed precisely the same issue in Barbara's case. The two cases were based on the same record, and depositions taken for Franklin's case had been available in Barbara's case. *See* 937 F.2d at 346. Indeed, the *Propst I* court all but formally reviewed the district court's decision in Franklin's case, as the lower court's reasoning in the former case had merely been extended without comment to Barbara's case. *See id.* at 343.

2. The appeal was consolidated with that of William Thomas in *Elliott v. Thomas*. Although the case bears that name, we will refer to it as "*Propst I*." The *Propst I* panel also dismissed for

After *Propst I* issued, the district court gave Franklin an opportunity to produce new evidence of the type that we had identified as dispositive in that opinion—" 'specific, non-conclusory factual allegations' that the administrative defendants sought to punish [him] on account of speech and disregarded other considerations." (*id.* at 346 (citation omitted).) In response, Franklin submitted only the deposition of Dillon Mapother, a professor of physics who had acted as a liaison between the Vice–Chancellor of Research and CERL. Mapother testified that in February or March of 1987, he gradually came to believe that Jane Loeb's investigation into the Propsts' allegations had turned into an investigation of the Propsts themselves and was aimed at developing a record that would allow the administration to take action against them. (Mapother Dep. at 53–56.) Mapother did not, however, point to any specific facts or conversations that supported this theory, and he conceded that he could only speculate as to who might have given Loeb this directive. (*Id.* at 55–56.) In addition, as already noted, Loeb's informal probe was soon discontinued in favor of a formal investigatory audit by the University's auditing department, and Franklin was not transferred from his post until after that audit was concluded.

This testimony was clearly insufficient to save Franklin from the mandate of *Propst I*. The uncontroverted evidence established that Franklin was transferred only after the defendants had received numerous complaints from CERL employees concerning the destruction of working relationships in the Laboratory, and after the completion of the independent audit that absolved Bitzer of wrongdoing. Franklin has pointed to no evidence suggesting that Loeb's investigation, suspended in early 1987, played any role in the administrators' ultimate decision to transfer Franklin some eight months later. Mapother's opinion does no more than Franklin's or Barbara's to call the administrators' motives into question. It does not undercut the administrators' evidence that they had con-

want of jurisdiction Bitzer's interlocutory appeal, which raised defenses unrelated to the qualified immunity issue. 937 F.2d at 342.

ferred with CERL employees, other university administrators, and the auditors before acting and that the information thereby gathered provided a legitimate basis for their decision. Like Barbara, then, Franklin has failed to produce "'specific, nonconclusory factual allegations'" that Weir, Liebman and Berdahl transferred him in retaliation for his speech, rather than in an effort to promote the effective operation of CERL. The administrators are therefore entitled to qualified immunity from his suit, just as they were from Barbara's.

## B. *Bitzer*

■ After resolving the qualified immunity issue, the district court granted summary judgment to Bitzer, finding that even with all inferences in their favor, the Propsts had failed to establish that the transfers violated the First Amendment.[3] We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in favor of the Propsts. *Robinson v. PPG Indus., Inc.,* 23 F.3d 1159, 1162 (7th Cir.1994). If our examination of the record reveals that the Propsts have raised a genuine issue as to any fact that could determine the outcome of a trial, summary judgment will have been inappropriate. *Betaco, Inc. v. Cessna Aircraft Co.,* 32 F.3d 1126, 1132 (7th Cir.1994).

■ In *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court established that the First Amendment protects public employees from retribution for speech that touches on a matter of public concern, provided that the employee's interest in expressing herself is not "outweighed by any injury the speech could cause to 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35; *see also Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994);

*Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). The proper balance of these competing interests is a question of law. *See Connick,* 461 U.S. at 150 & n. 10, 103 S.Ct. at 1691 & n. 10; *Breuer v. Hart,* 909 F.2d 1035, 1037 (7th Cir.1990).

Bitzer has conceded that the Propsts' speech—alleging misuse of a state university's funds—involved a matter of public concern. Along with other courts, we have recognized the importance of an employee's interest in pointing out a misuse of public funds or other breach of public trust. *See Conner v. Reinhard,* 847 F.2d 384, 390–91 (7th Cir.), *cert. denied,* 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988); *Knapp v. Whitaker,* 757 F.2d 827, 841–42 (7th Cir.), *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985); *see also O'Connor v. Steeves,* 994 F.2d 905, 915–16 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993); *O'Donnell v. Yanchulis,* 875 F.2d 1059, 1061–62 (3d Cir.1989); *Conaway v. Smith,* 853 F.2d 789, 797–98 (10th Cir.1988). As the Tenth Circuit observed in *Conaway,* "[s]peech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." 853 F.2d at 797.

■ The Propsts interest in speaking out on these issues, however, must be balanced against the State's interest in the efficient operation of CERL. The State's interest can be assessed in terms of a variety of factors, including whether the speech impeded the employee's ability to perform his or her job and whether the speech undermined close working relationships that were essential to the fulfillment of public responsibilities. *See Glass v. Dachel,* 2 F.3d 733, 742 (7th Cir. 1993) (collecting cases); *see also Connick,* 461 U.S. at 150–53, 103 S.Ct. at 1692–93. As the Supreme Court explained in *Connick,* "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's

---

**3.** The issue raised before the district court was actually twofold: (1) whether the transfers violated the First Amendment, and (2) whether Bitzer played a role in bringing about the transfers. Because we find no First Amendment violation, we need not reach the issue of Bitzer's role. Although Bitzer is the sole remaining defendant, our discussion will therefore refer to all defendants, as individual responsibility is not relevant.

judgment is appropriate." 461 U.S. at 151–52, 103 S.Ct. at 1692; *cf. Pickering*, 391 U.S. at 569–73, 88 S.Ct. at 1735–37 (teacher's letter to local newspaper critical of school board members with whom teacher had no close working relationship "would not normally have any necessary impact on the actual operation of the schools, beyond its tendency to anger the Board").

Here, the defendants' position that the Propsts' were transferred because their speech was highly disruptive to close working relationships in a workplace that required loyalty and confidence is amply corroborated and is not undermined by any of the Propsts' evidence. Indeed, Franklin's own deposition testimony reveals that the Propsts' relationship with Bitzer deteriorated to the point of affecting their ability to work with him. Franklin acknowledged that the nature of his responsibilities required loyalty, mutual regard and trust between himself and Bitzer, and that by July 1987, their relationship had lost all of those qualities. (Franklin Dep. at 517, 521.) He also testified that as the summer wore on, he found it increasingly difficult to perform his functions as Associate Director of CERL. (*Id.* at 516–18.) In fact, Franklin explained that Bitzer and the Propsts eventually stopped speaking to one another directly and managed to communicate only by way of a "go-between." (*Id.* at 521.)

The evidence also revealed that the disruption extended beyond Barbara and Franklin, affecting other CERL employees as well. During the six-month audit, two groups of CERL business office employees met with Berdahl to complain that the audit was undermining their work and that the business office was no longer functioning efficiently. Several employees also told Berdahl that they perceived Franklin and Barbara Propst to be intentionally impeding the work of the Laboratory. At the second meeting, the employees threatened to resign if the disruption persisted. By early fall of 1987, Weir and Liebman also had received numerous reports that morale at CERL was low and that the research work of the Laboratory was behind

schedule. Barbara testified that she and her husband felt increasingly isolated from the other CERL employees, who were at times reluctant to work with them. (Barbara Dep. at 235–36.)

The Propsts have attempted to counter this evidence with the depositions of several CERL employees who testified that their work was not affected by the Propsts' allegations concerning Bitzer or that the allegations did not interfere with the day-to-day operations of the business office. (*See, e.g.,* Stifle Dep. at 8–10; Barry Dep. at 12; Rypski Dep. at 5–7.) But this testimony does not suffice to raise a question of material fact. The fact that some CERL employees did not feel affected does not negate the fact that others did. The Propsts offered no evidence contradicting the fact that several CERL employees met with Berdahl and threatened to resign. That fact therefore remains uncontested. Nor is there any evidence suggesting that the Propsts' relationship with Bitzer was not significantly affected. Indeed, that fact is supported by Franklin's own testimony. There is therefore no factual dispute that the Propsts' relationship with Bitzer was seriously undermined and that at least some other CERL employees found the tension in the laboratory to be intolerable.

There is thus no question of fact that CERL's operations were significantly disrupted. Because the evidence unequivocally establishes that, as a result of the Propsts' accusations, CERL could no longer accomplish its mission unless either Bitzer or the Propsts were removed from the Laboratory, the Propsts' First Amendment rights were not violated by their transfer. This holding is consistent with that of cases such as *Marquez v. Turnock*, 967 F.2d 1175, 1176–77, 1179 (7th Cir.1992), and *Breuer*, 909 F.2d at 1039–42.

### C. *State law claims*

■ The Propsts also challenge the district court's dismissal of their state law retaliatory discharge claims against all of the defendants under Fed.R.Civ.P. 12(b)(6).[4]

---

**4.** Although the complaints are somewhat unclear as to the precise basis of the Propsts' state law

claims, the parties as well as the district court

We review de novo the district court's dismissal of claims under Rule 12(b)(6), accepting as true all well-pleaded factual allegations and drawing all reasonable inferences in the Propsts' favor. *Edward E. Gillen Co. v. City of Lake Forest,* 3 F.3d 192, 197 (7th Cir. 1993).

■ To state a claim for retaliatory discharge under Illinois law, plaintiffs must allege (1) that they were discharged, (2) that their discharge was in retaliation for their activities, and (3) that their discharge violated a clearly mandated public policy of the State of Illinois. *Ludwig v. C & A Wallcoverings, Inc.,* 960 F.2d 40, 42 (7th Cir.1992) (citing *Hinthorn v. Roland's of Bloomington, Inc.,* 119 Ill.2d 526, 116 Ill.Dec. 694, 696, 519 N.E.2d 909, 911 (1988); *Barr v. Kelso–Burnett Co.,* 106 Ill.2d 520, 88 Ill.Dec. 628, 632, 478 N.E.2d 1354, 1358 (1985)).

■ The Propsts have sought to circumvent the obvious problems posed by the first requirement through a theory of constructive discharge, but their attempt fails because it is contrary to Illinois law. As we have previously observed, "Illinois courts have repeatedly expressed their reluctance to expand the tort [of retaliatory discharge] beyond its original confines, particularly with respect to the first element of discharge." *Ludwig,* 960 F.2d at 42–43 (collecting cases). Illinois courts have therefore consistently refused to recognize constructive discharge as the basis for retaliatory discharge claims. *Id.* (citing *Grey v. First Nat'l Bank,* 169 Ill.App.3d 936, 120 Ill.Dec. 227, 232 n. 2, 523 N.E.2d 1138, 1143 n. 2 (1988), and *Scheller v. Health Care Service Corp.,* 138 Ill.App.3d

219, 92 Ill.Dec. 471, 480, 485 N.E.2d 26, 35 (1985)).[5]

■ The Propsts point out that since we decided *Ludwig,* the Illinois Supreme Court has agreed to consider the issue of whether a "retaliatory demotion" may be actionable. *See Zimmerman v. Buchheit of Sparta, Inc.,* 245 Ill.App.3d 679, 185 Ill.Dec. 921, 615 N.E.2d 791 *appeal granted,* 152 Ill.2d 582, 190 Ill.Dec. 913, 622 N.E.2d 1230 (1993). In *Zimmerman,* the Illinois Appellate Court reversed the dismissal of a retaliatory discharge claim where the plaintiff alleged that she had been demoted and that her hours had been reduced in retaliation for seeking workers' compensation benefits. *Id.* at 922, 615 N.E.2d at 792. Zimmerman sought damages for lost income and benefits that had resulted from her demotion. *Id.* Should the Illinois Supreme Court affirm the Appellate Court's decision in *Zimmerman* and recognize a retaliation claim in the context of a demotion that entails tangible economic loss, however, the Propsts' claim still would not be saved. The Propsts have not offered any evidence suggesting that their transfers amounted to a demotion or resulted in decreased salaries, benefits or rank. Indeed, the evidence revealed that they experienced no loss of either compensation or rank and that they received their scheduled salary increases. The district court's dismissal of their retaliatory discharge claim was therefore proper.

### III.

We AFFIRM the district court's grant of summary judgment in favor of Bitzer, Weir,

---

have treated them as retaliatory discharge claims.

**5.** In addition, in Illinois, a plaintiff seeking to establish a constructive discharge must show that "the employer deliberately or intentionally made the employee's working conditions so intolerable that a reasonable person would have felt compelled to resign to escape the intolerable conditions." *Dudycz v. City of Chicago,* 206 Ill. App.3d 128, 151 Ill.Dec. 16, 20, 563 N.E.2d 1122, 1126 (1990) (citations omitted), *appeal denied,* 136 Ill.2d 543, 153 Ill.Dec. 372, 567 N.E.2d 330 (1991); *see also Motley v. Illinois Human Rights Comm'n,* 263 Ill.App.3d 367, 200 Ill.Dec. 909, 913, 636 N.E.2d 100, 104 (1994) (focus in

constructive discharge case is on whether reasonable employee in plaintiff's position would have felt compelled to resign). *Steele v. Illinois Human Rights Comm'n,* 160 Ill.App.3d 577, 112 Ill.Dec. 568, 570–71, 513 N.E.2d 1177, 1179–80 (1987); *Brewington v. Illinois Department of Corrections,* 161 Ill.App.3d 54, 112 Ill.Dec. 447, 451, 513 N.E.2d 1056, 1060 (1987). Thus, even if a constructive discharge theory were legally cognizable, the Propsts have failed to allege constructive discharge under Illinois law. They have not shown that they faced intolerable working conditions in their new positions or that they felt compelled to resign.

Liebman and Berdahl as well as its dismissal of the Propsts' state law claims.