Marcus B. FELDMAN, Plaintiff–
Appellee, Cross–Appellant,

v.

Chung–Wu HO and Board of Trustees of
Southern Illinois University, Defen-
dants–Appellants, Cross–Appellees.

Nos. 97–4243, 98–1074.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 29, 1998.

Decided March 22, 1999.

Mark G. Arnold, Alan E. Popkin, James
F. Monafo, Husch & Eppenberger, St.
Louis, MO, argued, for Plaintiff–Appellee,
Cross–Appellant.

Carla J. Rozycki (argued), Julia H. Perkins, Jenner & Block, Chicago, IL; John L. Gilbert, Reed, Armstrong, Gorman, Coffey, Gilbert & Mudge, Edwardsville, IL, for Defedants–Appellants, Cross–Appellees.

Before HARLINGTON WOOD, JR., FLAUM, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Southern Illinois University decided in spring 1990 not to renew the contract of Marcus Feldman, an assistant professor of mathematics then in his fourth year of teaching. Feldman received a terminal contract through June 1991. Litigation challenging this decision under the first amendment has lasted twice as long as Feldman's stint at the University.

Feldman charged Chung–Wu Ho, the Chairman of the Mathematics and Statistics Department, and many other leaders of the University with violating his freedom of speech. When the litigation began, his theory was that Ho had protected another colleague against Feldman's charge of plagiarism, by giving the accused colleague tenure while seeing to it that Feldman departed. On an interlocutory appeal we held that some of the defendants were protected from suit by the eleventh amendment, and that Ho had immunity from damages on a first amendment claim. *Feldman v. Bahn*, 12 F.3d 730 (7th Cir. 1993). Feldman then recast his theory. In the new telling, Feldman had accused another colleague of trying to improve her standing by claiming falsely that she had written a paper jointly with a famous mathematician. The accused member of the faculty denied the charge, Ho took her side, and Feldman was given a terminal contract as a result. This contention was submitted to a jury, which returned a verdict of some $250,000 against Ho ($200,000 in actual and $50,000 in punitive damages) on a state-law claim that Ho interfered with Feldman's contract of employment. The jury also returned a verdict in Feldman's favor on a first-amendment theory

against the University (technically, its trustees, named as its proxies under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Because of the eleventh amendment, damages were unavailable from the University (an arm of Illinois), but the verdict would have entitled the district judge to fashion equitable relief such as reinstatement. This the judge declined to do, remarking that the damages awarded against Ho are sufficient compensation. He also refused to award interest on the portion of the damages that represent back pay. But the judge did order the University to pay more than $185,000 as Feldman's legal fees. Cross-appeals challenge every aspect of this decision.

Given the verdict, we must assume that Ho reacted adversely to Feldman's accusation against his colleague and that this led the University to end Feldman's employment. We assume, moreover, that the academic conduct (or misconduct) of teachers at a state university is an issue of public importance rather than just of private interest to the persons involved. Compare *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), with *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). But it does not follow that a jury rather than the faculty determines whether Feldman's accusation was correct. A university's academic independence is protected by the Constitution, just like a faculty member's own speech. Concurring in *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), Justices Frankfurter and Harlan referred to the four freedoms *of a university*: "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." Although statutes have curtailed some of these freedoms (for example, no university today may use racial criteria to select its faculty), Feldman does not rely on any particular statute, as opposed to the all-purpose 42

U.S.C. § 1983 that provides a hook for enforcing the Constitution against state actors. Yet the Constitution does not commit to decision by a jury every speech-related dispute. If it did, that would be the end of a university's ability to choose its faculty—for it is speech that lies at the core of scholarship, and every academic decision is in the end a decision about speech.

> Teachers ... speak and write for a living and are eager to protect both public and private interests in freedom to stake out controversial positions. Yet they also *evaluate* speech for a living and are eager to protect both public and private interests in the ability to judge the speech of others and react adversely to some. They grade their students' papers and performance in class. They edit journals, which reject scholarly papers of poor quality. They evaluate their colleagues' academic writing, and they deny continuing employment to professors whose speech does not meet their institution's standards of quality. See *Weinstein v. University of Illinois*, 811 F.2d 1091 (7th Cir.1987). "The government" as an abstraction could not penalize any citizen for misunderstanding the views of Karl Marx or misrepresenting the political philosophy of James Madison, but a Department of Political Science can and should show such a person the door—and a public university may sack a professor of chemistry who insists on instructing his students in moral philosophy or publishes only romance novels. Every university evaluates *and acts* on the basis of speech by members of the faculty; indeed, Feldman proposed that Ho do just this on the basis of his colleague's speech.... Feldman ... does not deny that speech in a university may be the basis of adverse action; he believes, rather, that the penalty should have fallen on the accused colleague rather than himself. Yet an unsupported charge of [academic misconduct] reflects poorly on the accuser; the first amendment does not ensure that a faculty member whose assessment of a colleague's work reveals bad judgment will escape the consequences of that revelation.

*Feldman v. Bahn*, 12 F.3d at 732–33 (emphasis in original). When sending this case to the jury, and resolving post-judgment motions, the district judge ignored these observations. Indeed, one could not tell from reading the district judge's opinions that the parties' dispute had ever reached this court before.

■ Speech often is a legitimate ground of decision in employment. Consider the political patronage cases. Although a state may not prefer Republican road crews over Democratic ones, *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), it may use political affiliation as a ground of decision for many other jobs. "[T]he Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments. In sum, the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). That principle cannot be limited to political affiliation. "[T]he question is whether the hiring authority can demonstrate that [speech] is an appropriate requirement for the effective performance of the public office involved." *Waters v. Churchill*, 511 U.S. 661, 671–75, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech

of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate." *Id.* at 675. (This passage appears in Justice O'Connor's plurality opinion, but seven Justices approved the principle. See 511 U.S. at 685 (Souter, J., concurring), 688–89 (Scalia, J., joined by Kennedy & Thomas, JJ., concurring in the judgment).)

A university seeks to accumulate and disseminate knowledge; for a university to function well, it must be able to decide which members of its faculty are productive scholars and which are not (or, worse, are distracting those who are). As we said the first time around, an unsubstantiated charge of academic misconduct not only squanders the time of other faculty members (who must analyze the charge, or defend against it) but also reflects poorly on the judgment of the accuser. A university is entitled to decide for itself whether the charge is sound; transferring that decision to the jury in the name of the first amendment would undermine the university's mission—not only by committing an academic decision to amateurs (is a jury really the best institution to determine who should receive credit for a paper in mathematics?) but also by creating the possibility of substantial damages when jurors disagree with the faculty's resolution, a possibility that could discourage universities from acting to improve their faculty. Cf. *Webb v. Ball State University,* 167 F.3d 1146 (7th Cir.1999). In the wake of *Waters* the second circuit held that a university may respond to an incendiary public speech by a faculty member without violating the first amendment, even though the speech addresses issues of public concern. *Jeffries v. Harleston,* 52 F.3d 9 (2d Cir.1995). *Jeffries* was a hard case, because the speech was given off campus. Our case is easy: Feldman charged a colleague with academic misconduct; the University investigated the charge and vindicated the colleague; and later it con-

cluded that it could obtain better mathematicians than Feldman for its faculty. If the kind of decision Southern Illinois University made about Feldman is mete for litigation, then we might as well commit all tenure decisions to juries, for all are equally based on speech. If the University erred in telling Feldman to seek employment elsewhere that is unfortunate, but the only way to preserve academic freedom is to keep claims of academic error out of the legal maw.

█ A public employer's entitlement to consider speech under *Waters* is limited to the kind of speech that is part of the employer's mission. If Feldman had campaigned for a candidate for Governor he could not have been sacked for supporting the losing party—though the University could require its faculty to refrain from running for office or injecting politics into the workplace. See *CSC v. Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Accusing the University's President of padding his expense account would have been a closer issue. See *Levenstein v. Salafsky,* 164 F.3d 345 (7th Cir.1998). How public employees handle public funds is a matter of public concern, but if the speech proves excessively disruptive to the employer's mission then the employer may respond. Thus a faculty member's unwarranted charge of embezzlement might justify discipline under the approach of *Pickering.* But Feldman's speech was neither unrelated to his job (the case of supporting a Democrat for Governor) nor unrelated to mathematics (the case of charging the President with fiscal improprieties). Nor was it concerned with the *rules* by which academic departments at Southern Illinois University evaluate charges of scholarly misconduct. Feldman objected to the way the Mathematics Department handled its core business of choosing and promoting scholars. That task is both inevitably concerned with speech and so central to a

university's mission that the university's role as employer dominates. This conclusion also knocks out the award of attorneys fees and makes it unnecessary to discuss Feldman's cross appeal, which seeks additional relief against the University.

■ Feldman's claim against Ho personally requires only brief analysis. He recovered under a state-law theory of tortious interference with contract. Ho advanced a jurisdictional defense: that this is a suit against the state, and thus foreclosed in federal court by the eleventh amendment. Feldman concedes that Illinois treats the state as the real party in interest, provides the public official with absolute immunity, and channels any litigation to the Illinois Court of Claims with the state as the defendant, whenever judgment for the plaintiff would control the state's actions. 705 ILCS 505/8(d); *Currie v. Lao*, 148 Ill.2d 151, 170 Ill.Dec. 297, 592 N.E.2d 977 (1992). In a case that is almost the clone of ours, *Wozniak v. Conry*, 288 Ill.App.3d 129, 679 N.E.2d 1255 (1997), the court applied this rule to a suit by a faculty member of the University of Illinois against the department's chairman. Wozniak accused the chairman of falsely charging him with failure to live up to professional standards, tortiously interfering with his employment at the University because the chairman's statements cost him his teaching position. The court responded that such a claim is in effect one against the State of Illinois and may not proceed against the department's chairman.

■ Illinois follows the federal practice by making an exception for situations in which the public employee did not act within the scope of his employment or violated the Constitution. Under the Westfall Act, any tort claim against a federal employee for wrongs committed within the scope of his employment must be dismissed, and the United States substituted as the defendant, unless the plaintiff establishes a "constitutional tort." 28 U.S.C. § 2679(b)(2)(A); *Gutierrez de*

*Martinez v. Lamagno*, 515 U.S. 417, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995); *United States v. Smith*, 499 U.S. 160, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). Likewise in Illinois: "Whenever a state employee performs illegally, unconstitutionally, or without authority, a suit may still be maintained against the employee in his individual capacity and does not constitute an action against the State of Illinois." *Wozniak*, 679 N.E.2d at 1259. See also *Nelson v. Murphy*, 44 F.3d 497, 505 (7th Cir.1995). Feldman persuaded the district judge to allow his suit to proceed on the theory that Ho violated the first amendment. Yet we held in 1993 that Ho has immunity against any claim resting on the first amendment—and now we add, in light of the rest of this opinion, that there was no constitutional violation by the University as an entity. Ho acted within the scope of his employment when handling matters related to Feldman's tenure on the faculty, because "the occasion ... would have justified the act, if [Ho] had been using his power for any of the purposes on whose account it was vested in him." *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949) (L.Hand, J.); see also *Cross v. Fiscus*, 830 F.2d 755, 757 (7th Cir.1987); *Restatement (2d) of Agency* §§ 228–29, 231–36 (1958). In this respect Ho's conduct is identical to Conry's. Whatever remedy state law offers to Feldman must come in a suit against the State of Illinois, and because of the eleventh amendment that suit belongs in state court.

The judgment is reversed, and the case is remanded with instructions to enter judgment on the merits for all defendants—but without prejudice to Feldman's ability to file suit against the State of Illinois in the state's Court of Claims.