# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-1297

LORI CYGAN,

*Plaintiff-Appellant,*

v.

WISCONSIN DEPARTMENT OF CORRECTIONS,
JON E. LITSCHER, DANIEL BERTRAND, et al.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 C 4—**William C. Griesbach**, *Judge.*

———————

ARGUED SEPTEMBER 8, 2004—DECIDED NOVEMBER 10, 2004

———————

Before BAUER, MANION, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* After the termination of her employment at the Wisconsin Department of Corrections ("DOC") facility in Green Bay, plaintiff Lori Cygan filed a lawsuit against the DOC and various DOC officials under 42 U.S.C. § 1983. Cygan alleged that the defendants violated her constitutional rights by firing her in retaliation for exercising her First Amendment rights, and by failing to afford her due process in connection with the termination. Cygan also advanced a state law retaliation claim. The district court granted the defendants summary judgment on all three

theories. Cygan limits her appeal to the district court's decision on her First Amendment retaliation claim. We affirm.

## I. Background

Cygan worked for fourteen years as a prison guard at the Green Bay Correctional Institution ("GBCI"), a maximum-security facility operated by the Wisconsin DOC. GBCI houses over 1,040 of Wisconsin's violent offenders. Cygan was a second-shift Rotunda Officer at GBCI, responsible for security of the rotunda, supervising inmate movement, operating gates leading into the rotunda, and supervising inmates during the evening meal.

## A. Cygan's Performance at GBCI

Throughout the majority of her tenure at GBCI, Cygan had positive performance evaluations. However, starting in 1997, various supervisors began to take issue with Cygan's job performance. For example, in reviewing Cygan's performance from October 1997 through October 1998, Dennis Natzke, Cygan's immediate supervisor, wrote:

> Officer Cygan has an excellent work ethic. . . . I do have concern with Officer Cygan and that is her patience with newer employees. She needs to understand that everyone has to go through a learning process and they will not be as efficient as someone who does the same routine every day will. While she has the ability to teach these officers I feel she would rather do it herself than take the time to train. . . . I believe she needs to consider all other personnel as her equal, which she sometimes has a problem with when dealing with new officers. This is a very real concern and I feel she needs to address this soon as some officers do not care to work in the cell hall because of this . . . . She needs to learn to

become more personable when working with officers that are not regulars in her work unit.

Robin Rogers, Cygan's supervisor in 2001, expressed similar concerns when evaluating Cygan in November 2001. Rogers wrote that Cygan was not meeting institutional standards with respect to interpersonal relationships. Rogers also specifically noted that there had been "several occurrences of [Cygan] being discourteous and insensitive to staff and inmates during this reporting period," and that "Cygan did not meet the standards for having sensitivity to others and their problems, feelings and rights, being courteous and tactful and to respond positively to constructive criticism and supervision."

Defendant Peter Erickson, the security director at GBCI since 2002, initiated an investigation into Cygan's behavior in June 2001 after receiving a complaint about Cygan's use of profanity and other derogatory language when referring to junior officers. During the course of the investigation, three junior officers confirmed that Cygan had treated them in an unprofessional manner. After the investigation, defendant Daniel Bertrand, the Warden of GBCI, directed Cygan to attend a training on professionalism, and issued her an official letter of reprimand for violating DOC Work Rule 13, which prohibits the following conduct:

13. Intimidating, interfering with, harassing (including sexual or racial harassment), demeaning, or using abusive language in dealing with others.

Cygan was also disciplined twice in October 2001. The first incident involved a complaint by Health Services Unit Manager Jeanne Hertel. Hertel complained that Cygan failed to promptly open a gate to allow Hertel to pass to her destination within the institution. After a pre-disciplinary interview where Cygan stated that she did not remember the incident, Warden Bertrand sent Cygan notice that she was suspended without pay for one day for negligence in

performing assigned duties. The second incident stemmed from a complaint that Cygan had made a loud and threatening comment to an inmate. Cygan admitted that she yelled at the inmate, but she denied using threats or profanity. Warden Bertrand suspended Cygan three days without pay as a result of this incident.

As related above, Warden Bertrand directed Cygan to attend a training on professionalism after the June 2001 complaint. Cygan attended the required class, but the class instructor, a professor from the University of Wisconsin-Milwaukee, reported that she was disruptive, inattentive, and disrespectful during the class. In an e-mail sent to GBCI, the instructor stated that Cygan arrived late, talked incessantly, laughed during the presentation, and slept on the table. Based on the e-mail from the instructor and corroborating statements from other class attendees, Warden Bertrand suspended Cygan without pay for one day.

## B. Cygan's Speech Activities at GBCI

GBCI staff often discussed security issues and other job-related issues with Deputy Warden Michael Baenen. Cygan had discussions with Baenen about her perceptions of poor communication between GBCI staff, low morale, inadequate training for rookie officers, lack of radios for prison staff, problems with the prison camera security system, and staff shortages during meals. Other staff had raised some of the same concerns with Baenen. Cygan and Officer Chad Frappier, her union steward, filed grievances regarding staff shortages during meals, which were denied.

On November 23, 2001, Cygan met with Warden Bertrand in his office and complained about inadequate training and staffing at the prison and about the administration's failure to repair the security cameras in the South Cell Hall.

On December 25, 2001, a fight broke out between two inmates in the rotunda area near the cafeteria during the

second-shift meal. Cygan and three other responding officers suffered minor injuries while subduing the inmates. In her report about the incident, Cygan noted that the second-shift meal started with a shortage of staff, and that similar incidents could be avoided by "running the shift with enough officers."

On January 8, 2002, Cygan was assigned to supervise inmates during the evening meal. Defendant Michael Schultz, a Captain at GBCI, was Cygan's supervising officer that night. Although GBCI has a policy that provides, "GBCI will ensure that a minimum of ten correctional officers are assigned to the dining room areas for necessary meal coverage," the evening meal started with fewer than ten officers on hand.

The parties dispute some of the details regarding Cygan's behavior on that night. According to Schultz, Cygan was upset that the second-shift meal had started without ten officers present, and she yelled in the presence of other staff, "This is fucking bullshit. I am sick of this shit." Schultz testified that inmates working on the serving line may have heard Cygan's complaints. Schultz also heard Cygan yelling at Officer Frappier in the rotunda area just outside of the cafeteria. According to Schultz, Cygan was complaining loudly about officer coverage at meals and about the need for Frappier to do his job. Frappier was the union representative and Cygan wanted him to file a grievance regarding officer coverage at meals. Schultz considered Cygan's tone to be loud and profane, and he thought the conduct inappropriate and unprofessional. Believing Cygan's behavior would stop, Schultz walked toward the dining hall. However, according to Schultz, Cygan continued to yell and use profanity, and Schultz confronted Cygan in the rotunda area, saying, "Officer Cygan, if you want to take Officer Frappier into a different room and talk to him later, that's fine. But this conversation will not happen in the rotunda during meals." In response, Cygan yelled, "fine," and then turned

to other officers in the rotunda and yelled, "and this is professional?"

Cygan tells a different story. At a hearing about the incident, Cygan admitted that she was upset about the meal starting without ten officers present and she acknowledged raising her voice, but she denied using profanity and denied acting in an abusive manner. Cygan testified that she said, "I hate his place" when she learned that the meal was starting understaffed. In Cygan's view, it was Schultz who acted unprofessionally by yelling at her within inches of her face in front of other officers. Cygan also admitted that she urged Frappier to file a grievance because "GBCI does not seem to care about our safety." Frappier largely corroborated Cygan's story.

On January 21, 2002, a boiler broke down at the prison and inmates became upset when they learned that they would not have showers that evening. On January 22, 2002, about fifty inmates dumped their dirty laundry on the sergeant's desk during the noon hour. A fight subsequently broke out between inmates and officers, and eight officers were taken to the hospital for treatment. During the second shift on January 22, Cygan told Deputy Warden Baenen that she thought that Captain Schultz had mishandled the shower situation and the subsequent disturbance. Cygan also told Baenen that Security Director Erickson had stayed in his office during the disturbance and failed to check on the situation. Baenen later discussed the issues with Erickson and Schultz.

On January 29, 2002, defendant Jon Litscher, the Secretary of the DOC, met with staff at GBCI to discuss the January 22 disturbance. While Secretary Litscher was touring the facility with Warden Bertrand, Cygan asked Litscher if she could speak to him alone. Litscher agreed, and Cygan and two other officers told him that they were concerned about the security issues at the prison that Warden Bertrand had

not adequately addressed. Cygan handed him a list of concerns that had been compiled by second-shift officers, which included short-staffing at meals, malfunctioning security cameras, and low morale among front-line staff.

Secretary Litscher spoke to a number of GBCI employees on January 29, 2002, including Officer Patricia Janus. Janus spoke to Litscher about various work-related concerns and, like Cygan, gave Litscher a written list of concerns. Janus was not terminated or disciplined in any way for her speech; she is still employed at GBCI.

Baenen and Cygan had a discussion on January 30, 2002, in the lobby at GBCI. According to Cygan, Baenen told her, "there is a target on your back and it is getting bigger everyday." Baenen also told her that she would not have so much trouble if she could learn to keep her mouth shut. When asked about the conversation in his deposition, Baenen said that he could not remember his exact words, but that he wanted to warn Cygan "to be more careful about how you interact with people."

## C.  Termination of Cygan's Employment

On January 16, 2002, defendant Brad Nuss, the GBCI Human Resources Director, sent a memorandum requesting Cygan's termination to the DOC employment relations specialist in Madison, Wisconsin. The memorandum provided:

> We are requesting approval to terminate Officer Lori Cygan. . . . She is a long-term officer whose performance has deteriorated significantly in the past year. Officer Cygan has a history of directing abusive, demeaning, and derogatory language at coworkers and inmates.

The memorandum then detailed a series of incidents and disciplinary actions taken against Cygan, and stated that "[Cygan] has shown absolutely no willingness to change"

despite the discipline.

On February 5, 2002, Cindy O'Donnell, the Deputy Secretary of the DOC, reviewed GBCI's termination recommendation and gave her approval to terminate Cygan. O'Donnell, who receives approximately twenty such recommendations each month, never discussed the Cygan termination with Secretary Litscher nor did O'Donnell and Litscher discuss Cygan's performance or employment at GBCI.

On February 6, 2002, Warden Bertrand sent Cygan notification that her employment was terminated effective immediately. In the termination letter, Bertrand informed Cygan that she was terminated due to her repeated violations of Work Rule 13 (which prohibits intimidating, abusive, and demeaning behavior). The letter specifically mentioned five incidents where Cygan had violated Work Rule 13 or other DOC rules, and noted that her behavior had resulted in three suspensions and a written reprimand.

## D. Cygan's Federal Lawsuit

Cygan challenged the constitutionality of her dismissal by filing a federal lawsuit under 42 U.S.C. § 1983 in January 2003, advancing a First Amendment retaliation claim, a due process claim, and a state law retaliation claim. The district court disposed of all three claims at the summary judgment stage. Cygan appeals only the court's ruling on her First Amendment claim. With regard to this claim, the district court observed that Cygan's affidavit lacked specificity about her complaints, but concluded for purposes of summary judgment that her speech addressed matters of public concern. The court then ruled that Cygan failed to prove causation or show pretext, and granted summary judgment.

## II.  Discussion

### A.  Standard of Review

We review *de novo* the district court's decision to grant summary judgment. *Wainscott v. Henry*, 315 F.3d 844, 848 (7th Cir. 2003). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We may affirm the district court on any basis supported by the record. *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 603 (7th Cir. 1999).

### B.  First Amendment

Individuals do not relinquish their First Amendment rights to free speech by accepting employment with the government. *See Pickering v. Bd. of Educ. of Township High Sch. Dist.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed. 2d (1968). Nevertheless, the government as an employer has an interest in conducting its affairs as efficiently and effectively as possible. *Waters v. Churchill*, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). As a consequence, public employees do not have the unfettered right to express themselves on matters related to their official responsibilities, and courts must give due weight to the government's interest in efficient employment decisionmaking when evaluating First Amendment retaliation claims. *Id.*

In analyzing a First Amendment retaliation claim brought under § 1983, we apply a three-step test premised on the Supreme Court's decisions in *Pickering, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed. 2d 471 (1977), and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed 2d 708 (1983). First, we must determine whether the plaintiff's speech was constitutionally

protected. Second, the plaintiff must establish that the speech was a substantial or motivating factor in her termination. Third, defendants then have the opportunity to show that the plaintiff would have been fired even in the absence of the protected speech. *Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004).

At the outset, we identify the instances of speech at issue in order to evaluate their protected status under the First Amendment. Cygan's speech distills into six categories: (1) the general complaints to Deputy Warden Baenen about low morale, poor communication, inadequate training for rookie officers, lack of radios for prison staff, problems with the prison camera security system, and staff shortages during meals; (2) the November 23, 2001, meeting with Warden Bertrand where Cygan commented on inadequate training and staffing at the prison and the failure to repair security cameras in the South Cell Hall; (3) Cygan's report after the December 25, 2001, fight in the cafeteria; (4) the January 8, 2002, incident during the evening meal; (5) Cygan's conversation with Deputy Warden Baenen on January 22, 2002, where she criticized how Schultz handled a prisoner disturbance the day before; and (6) Cygan's January 29, 2002, written list of concerns and comments to Secretary Litscher. We analyze each instance of speech separately to determine its protected status. *Wright v. Ill. Dept. of Children & Family Servs.*, 40 F.3d 1492, 1499 (7th Cir. 1994).

However, it is only necessary to analyze the speech for which Cygan was terminated. *Wright*, 40 F.3d at 1501. Although Cygan mentions other instances of speech when discussing the facts, she focuses almost entirely on the events of January 8, 2002, in her analysis section. Notably, Cygan fails to provide any evidence of a causal link between the first three instances of speech listed above and her termination. While those instances of speech may provide relevant background information in this case, the complete absence of evidence linking those speech activities to Cygan's termi-

nation renders it unnecessary to analyze their protected status. *See Wright*, 40 F.3d at 1501 (noting that courts need not analyze instances of speech under the First Amendment unless the plaintiff adequately links the speech to punishment meted out by defendant). At any rate, many of the topics covered in her litany of complaints strike us as relatively mundane concerns raised by a disgruntled public employee, rather than issues of public concern worthy of First Amendment protection.

We are thus left with the task of evaluating Cygan's speech on January 8, January 22, and January 29, 2002. In evaluating whether speech is constitutionally protected, we apply the two-step *Connick-Pickering* test. *Wainscott*, 315 F.3d at 848. First, under *Connick*, we determine whether the employee spoke as a citizen upon matters of public concern. *Connick*, 461 U.S. at 147. Second, if the employee spoke on a matter of public concern, we apply the *Pickering* balancing test, balancing the employee's interest in commenting upon such matters and the employer's interest in efficient public services. *Pickering*, 391 U.S. at 568.

When determining whether speech addresses a matter of public concern, we consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Of those three factors, content is the most important. *Wright*, 40 F.3d at 1501. In addition, an employee's choice of forum and motivation for speaking are also relevant considerations. *Id*. At bottom, we must decide whether the speech is most accurately characterized as an employee grievance, or as a matter of political, social, or other concern to the community. *Connick*, 461 U.S. at 146-47. With these standards in mind, we turn to the specifics of Cygan's speech on January 8, January 22, and January 29, 2002.

### 1. Cygan's Speech on January 8

### a. Matter of Public Concern

The parties dispute the circumstances surrounding Cygan's speech activities on January 8, 2002. Under *Waters*, we apply the *Connick-Pickering* test to the facts as the government employer found them to be, as long as the government's conclusion about the facts was reasonable. *Waters*, 511 U.S. at 676-77 (noting that if it were otherwise and the *Connick-Pickering* test was applied to the facts determined by a judicial factfinder, government employers would be forced "to come to its factual conclusions through procedures that substantially mirror the evidentiary rules used in court."). So, as a preliminary matter, we must decide whether GBCI management's view of the events on January 8 was reasonable.

After conducting an investigation into the January 8 incident, GBCI management concluded that Cygan violated Work Rule 13's prohibition on the use of demeaning and abusive language in dealing with others. In reaching their conclusion, defendants credited Captain Schultz's statement over the statements of Cygan and Frappier. According to Schultz, Cygan was upset that the second-shift meal started without ten officers present, and she complained in a loud, profane, and unprofessional manner in the presence of staff and inmates. Schultz confronted her and told her not to have that conversation with Frappier during the meal. Cygan, with corroborating testimony from Frappier, denied using profanity or acting in an abusive manner and faulted Schultz for acting unprofessionally and causing a scene.

After receiving a disciplinary report about the incident from Schultz, a pre-disciplinary meeting was held with Cygan, her union representative, and a GBCI management representative. Cygan was permitted to tell her side of the story at the meeting, during which she admitted to yelling but denied using profanity. Defendants were aware of nu-

merous previous complaints from different sources against Cygan for directing profane and derogatory language at both officers and inmates, and defendants knew that Cygan had denied using profane or abusive language after past complaints. This knowledge of Cygan's abusive behavior in the past, buttressed by their consideration of Captain Schultz's eyewitness statement and any insight gained from the face-to-face meeting with Cygan, provided GBCI management with a reasonable basis to credit Schultz's version of the events and discredit portions of Cygan and Frappier's statements. *See Waters*, 511 U.S. at 679 (explaining that courts will accept the employer's credibility determinations as long as they are reasonable and the employer used the care that a reasonable manager would use before making the determinations). We conclude that GBCI's findings about the events on January 8 were reasonable.

Applying the *Connick* test to defendants' version of the events on January 8, we conclude that Cygan's speech touched on matters of public concern. As we discussed above, content is the most important factor, and it is undisputed that Cygan was expressing her disagreement with Schultz's decision to start the second-shift meal with fewer than ten officers, which implicates prison security issues. Even though Cygan could be accurately characterized as a disgruntled employee and her speech may have been partially motivated by her dissatisfaction at GBCI and by concerns for her personal safety, speech touching on issues of internal prison security in a maximum security prison like GBCI is undoubtedly a matter of public concern. *See Spiegla v. Hull*, 371 F.3d 928, 936 (7th Cir. 2004).

We wish to emphasize, as we did in *Spiegla*, that not every prison employee complaint is a matter of constitutional magnitude. *Spiegla*, 371 F.3d at 936. As explained by the Supreme Court in *Connick*, government employee speech tied up in personal grievances or internal office affairs does not fall within the ambit of "public concern." *Connick*, 461 U.S.

at 148. In this case, Cygan's speech on January 8 brought attention to a staffing issue that had the potential to compromise prison security. Indeed, Cygan and other officers had suffered injuries a month earlier during an inmate fight in the cafeteria after the meal started with fewer than ten officers. These unique circumstances distinguish Cygan's January 8 speech from the type of mundane complaints about internal office policies at issue in cases like *Connick*. Having concluded that Cygan raised a matter of public concern, we will now analyze the speech under the *Pickering* balancing test.

### b.  Balancing of Interests

Under *Pickering*, we balance the employee's interest in commenting upon such matters and the employer's interest in efficient public services. *Pickering*, 391 U.S. at 568. One very important consideration is the "potential disruptiveness" of the speech. *Waters*, 511 U.S. at 681-82. Courts also consider whether the employment relationship is one in which personal loyalty and confidence are necessary, and the time, place, and manner of the speech. *Wainscott*, 315 F.3d at 851.

The time, place, and manner of Cygan's speech and its potential disruptiveness weigh heavily against her. In the cafeteria and rotunda of a maximum security prison that houses 1,040 of Wisconsin's violent offenders, Cygan yelled and swore about the evening meal starting with insufficient officer coverage. Both staff and inmates were present during Cygan's angry outburst. GBCI, as a correctional facility, has a very strong interest in maintaining order and control over inmates, and Cygan's decision to announce the shortage of staff in the presence of inmates could have endangered both staff and inmates by exposing them to opportunistic acts of violence.

Cygan's loud and profane complaints also serve to undermine the authority of Captain Schultz in the presence of

other officers and inmates. Correctional facilities, like police departments, are managed like military organizations, and respecting the authority of supervising officers is essential, especially in the presence of the inmates where a united front is crucial. That type of environment demands a high degree of personal loyalty and confidence, and Cygan's angry protestation of a supervising officer's decision in front of inmates and officers was ill-advised and unacceptable.

In fairness to Cygan, we must acknowledge that she had raised her concerns about short staffing through appropriate avenues on other occasions. However, her frustration with the situation did not justify a profanity-laced fit about short staffing within earshot of inmates and staff. In her anger, she could have caused the very danger she was apparently seeking to avoid through her complaints. This episode, on the heels of similar incidents and apparently unheeded disciplinary measures, could certainly cause GBCI to doubt Cygan's future effectiveness. As a matter of law, this potential disruptiveness outweighs whatever First Amendment value Cygan's January 8 speech might have had.

### 2. Cygan's Speech on January 22 and 29

Neither the district court nor the parties separately analyze whether Cygan's speech on January 22 or January 29 was constitutionally protected, and Cygan focuses her arguments almost entirely on the January 8 incident. The district court assumed for purposes of summary judgment that Cygan's speech, to the extent that it touched on issues of prison security and safety, was constitutionally protected, and then proceeded to grant defendants summary judgment on the basis of causation. Like the district court, we will assume *arguendo* that Cygan's speech on January 22 and 29 was constitutionally protected, and proceed to the causation prong because it is dispositive.

Under the framework announced by the Supreme Court in *Doyle*, Cygan must establish that her constitutionally protected speech on January 22 and 29 was a substantial or motivating factor in the defendants' decision to terminate her employment. *Doyle*, 429 U.S. at 287; *Spiegla*, 371 F.3d at 941 (clarifying that plaintiffs do not need to prove "but-for causation" to carry their burden on causation in First Amendment retaliation cases). If Cygan carries that burden, then defendants would have the burden of showing that she would have been fired even in the absence of the protected conduct. In this case, we need not reach that step because we conclude that Cygan failed to establish that her speech on January 22 and 29 was a substantial or motivating factor in her termination. To support her burden, Cygan relies on inferences drawn from the short time between her speech of January 22 and 29 and her termination, and on Deputy Warden Baenen's comments to her on January 30. To put Cygan's arguments into context, we begin our analysis by reviewing the relevant evidence on causation.

On January 16, 2002, GBCI management requested the DOC's approval to terminate Cygan because her performance had "deteriorated significantly in the past year" and due to Cygan's "history of directing abusive, demeaning, and derogatory language at coworkers and inmates." The DOC approved Cygan's termination on February 5, 2002, and Warden Bertrand notified Cygan of her termination the following day. Cygan's termination letter stated that she was fired for her repeated violations of DOC Work Rule 13, which prohibits demeaning and abusive language in dealing with others. The termination letter specifically mentioned five incidents where Cygan had violated Work Rule 13, and noted that her behavior had resulted in three suspensions and a written reprimand.

The two instances of speech under consideration occurred in January 2002, shortly before Cygan was terminated. First, on January 22, 2002, Cygan told Deputy Warden Baenen

that Captain Schultz had mishandled and aggravated a prisoner disturbance that stemmed from the prisoners' anger about a temporary lack of showers at GBCI. Cygan also told Baenen that Security Director Erickson had stayed in his office during the disturbance and failed to check on the situation. Second, on January 29, 2002, Cygan informed DOC Secretary Litscher that she and other officers were concerned about security issues at the prison and gave him a list of their concerns. The concerns included short-staffing of meals, malfunctioning of security cameras, and low morale among front-line staff. On January 30, 2002, Deputy Warden Baenen told Cygan that there was a target on her back, and advised her to keep her mouth shut.

As mentioned above, Cygan attempts to create a jury issue on causation based on the fact that she was terminated shortly after her late January speech activities. However, "we typically [do not] draw strong conclusions from the mere fact that protected speech may have preceded an adverse employment action." *Wright*, 40 F.3d at 1500. This is especially true in a case where the employee has a documented history of abusive and inappropriate behavior at work. *See Trnka v. Local Union No. 688*, 30 F.3d 60, 63 (7th Cir. 1994) ("To stave off summary judgment in a case where innocent or multiple explanations for a defendant's actions abound a plaintiff must rely on more than *post hoc, propter hoc* reasoning."). As the district judge observed in his thorough analysis of the causation prong, what stands out about this case is that the complaints about Cygan come from so many different sources. At least four different supervisors initiated complaints against Cygan or formally criticized her inappropriate behavior between 1997 and 2002. In addition, during 2001, GBCI management disciplined Cygan based on complaints lodged by a university professor at a professionalism course and a health services manager, two individuals who surely did not have an ax to grind with Cygan. In light of the uncontradicted record of Cygan's increasingly disrup-

tive behavior at GBCI, it would be inappropriate to attach significant weight to Cygan's *post hoc ergo propter hoc* reasoning.

The only other evidence Cygan offers on causation is her conversation with Deputy Warden Baenen on January 30. According to Cygan, Baenen told her that there was a target on her back, and that she needed to learn to keep her mouth shut. Baenen acknowledged having a conversation with Cygan on January 30, but testified that he could not remember the exact words he used that day. Baenen, who was a friend of Cygan, said that he wanted to warn Cygan "to be more careful about how you interact with people." In Cygan's view, Baenen's directive was aimed at the substance of her complaints, not her manner of expressing them. In essence, Cygan claims that Baenen was warning her to keep silent on prison security and safety issues.

Cygan's interpretation of the conversation seems implausible in the context of this case. First, Cygan and other officers had raised the same concerns on prior occasions and she has not presented any evidence that her prior complaints led to any disciplinary action. Second, Officer Janus also spoke with Secretary Litscher on January 29 and gave him a sealed envelope with a list of concerns, and she was not terminated or disciplined in any way, and continues to work at GBCI. Third, Cygan had a well-established track record of using profane and abusive language with inmates and officers alike. Given these circumstances, it is difficult to escape the conclusion that Baenen's advice on January 30 was directed at Cygan's consistently inappropriate manner of interacting with others, rather than the substance of her speech. Like the district court, we conclude that no reasonable jury could find that Cygan's speech activities on January 22 and 29 were a substantial factor in her termination.

## C.  Qualified Immunity

Defendants also argue that they are entitled to qualified immunity because they did not personally participate in any constitutional deprivation. Since the complaint has failed, we need not determine whether defendants were entitled to qualified immunity.

## III.  Conclusion

For the reasons stated herein, we AFFIRM the decision of the district court.

A true Copy:

Teste:

_____
***Clerk of the United States Court of
Appeals for the Seventh Circuit***