# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-3308

BENJAMIN R. BROOKS, M.D.,
MOHAMMED SANJAK, and
JENNIFER PARNELL,

*Plaintiffs-Appellants*,

v.

UNIVERSITY OF WISCONSIN BOARD
OF REGENTS, THOMAS P. SUTULA,
and GREGORY C. ZALESAK,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 C 125—**John C. Shabaz**, *Judge.*

———————

ARGUED JANUARY 13, 2005—DECIDED APRIL 28, 2005

———————

Before CUDAHY, EVANS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* This dispute arose after the University of Wisconsin Medical School closed a clinic (and a laboratory) devoted to the research and treatment of Multiple Sclerosis (MS) and Amyotrophic Lateral Sclerosis

(ALS), also known as Lou Gehrig's Disease. The plaintiffs, the clinic's founder and two employees, claim that the school closed the clinic because they spoke out against certain actions taken by the chairman of the neurology department. They allege that the closing violated their First Amendment and due process rights. A federal district court entered summary judgment in favor of various defendants affiliated with the school, prompting this appeal.

The Neurology Clinical Research Center (NCRC) focused on developing cures for neurological ailments and symptom management. Dr. Benjamin Brooks was the NCRC's director and founder and also served as director of the Motor Performance Laboratory (MPL), which conducted muscle strength tests on patients suffering from neurological diseases. The NCRC was funded from research grants, while the MPL operated via grants and clinical revenue.

Dr. Thomas Sutula is the chairman of the school's neurology department. In 2000, Sutula was named as a defendant in a civil lawsuit. Later, in connection with this lawsuit, Brooks refused to sign an in-house letter of support sent by neurology department staff to the dean of the medical school. In 2001, Brooks and NCRC administrator Jennifer Parnell criticized Sutula's plan to discontinue a program funded by the Muscular Dystrophy Association (MDA) which provided services for economically disadvantaged patients. In addition, they voiced concern to associate dean Paul DeLuca about Sutula's involvement with NeuroGenomeX, a private venture that competed against the school for grant money.

In January of 2002, Sutula prohibited Brooks from acquiring new patients for clinical trials because he was chronically late in submitting dictations. In March of 2003, Brooks met with DeLuca to discuss these restrictions, as well as the clinics' financial prospects and perceived attacks on his staff.

In May of 2003, the neurology department decided to close the MPL at the end of the year, citing financial reasons. In July of 2003, Sutula decided to shift management of clinical studies from the NCRC to another division within the neurology department. Parnell was initially laid off because the duties of the NCRC were being shifted elsewhere, but she was later hired to work in the other division.

Despite initial plans to close the lab at the end of 2003, the school shut the door a little earlier. In July, a former MPL employee expressed concerns about the general operation of the lab. And in August, neurology department administrator Gregory Zalesak discovered a student at the MPL preparing to perform unsupervised tests on an ALS patient. It was also learned that this student and others had access to confidential patient files. As a result of these unauthorized practices, DeLuca and senior vice-president Carl Getto decided to close the MPL immediately. DeLuca then created a committee to review the operations of the MPL. That committee concluded that the MPL could only be reopened if it were reorganized in accordance with the two other clinical labs within the neurology department. Due to the MPL's demise, in December of 2003 the school laid off associate professor Mohammed Sanjak. Brooks and Parnell remain at the school.

In January of 2004, Brooks, Parnell, and Sanjak brought this action in Dane County circuit court against Sutula, Zalesak, and the University of Wisconsin Board of Regents. The defendants removed the case to a federal district court pursuant to 28 U.S.C. § 1446. After discovery, the district court entered summary judgment in favor of the defendants, concluding that the plaintiffs failed to establish that they engaged in speech protected by the First Amendment or that they were deprived of property interests to sustain due process violations.

On appeal, the plaintiffs argue that the district court erred by entering summary judgment for the defendants on

their First Amendment and due process claims. We review this decision *de novo* and may affirm it for any reason supported by the record. *Cygan v. Wis. Dep't of Corrs.*, 388 F.3d 1092, 1098 (7th Cir. 2004).

We first consider the plaintiffs' First Amendment claims. They allege that the defendants shut down the research clinics in retaliation for their speaking out against Sutula. "A government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment." *City of San Diego v. Roe*, 125 S. Ct. 521, 523 (2004). Nevertheless, the government as an employer has an interest in conducting its operations as effectively as possible. *Cygan*, 388 F.3d at 1098 (citing *Waters v. Churchill*, 511 U.S. 661, 675 (1994)). Thus, public employees do not have an unfettered right to express themselves on matters related to their jobs, and courts must give due weight to the government's interest in efficient employment decisionmaking when evaluating retaliation claims. To establish First Amendment retaliation, a plaintiff must establish that the speech in question is constitutionally protected and that it was a substantial, or motivating, factor in the employer's retaliatory actions. *E.g.*, *Carreon v. Ill. Dep't of Human Servs.*, 395 F.3d 786, 791 (7th Cir. 2005). If the plaintiff establishes these elements, the burden shifts to the government to prove that it would have taken the same action in the absence of the protected speech.

Courts apply a two-step analysis to determine whether speech is constitutionally protected. First, we must decide whether the plaintiffs engaged in speech that addressed a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 143 (1983). In making this determination, *Connick* directs us to examine the content, form, and context of a statement as revealed by the entire record. 461 U.S. at 147-48. Moreover, "[t]he First Amendment is implicated when a public employee speaks as a citizen upon a matter of public concern, but not as an employee upon matters only of personal

interest." *Michael v. St. Joseph County*, 259 F.3d 842, 846 (7th Cir. 2001) (citing *Myers v. Hasara*, 226 F.3d 821, 826 (7th Cir. 2000)). Thus, we must evaluate whether the plaintiffs' speech is most accurately characterized as employee grievances or as a community concern. *See Carreon*, 395 F.3d at 791; *Cygan*, 388 F.3d at 1099. Second, if the plaintiffs spoke on matters of public concern, we must then balance their interest in expression against the school's interest in promoting effective and efficient public service. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

The district court only reached the first step, concluding that the plaintiffs failed to establish that they engaged in protected speech. The plaintiffs identify several instances of speech which they claim are constitutionally protected. Brooks cites his failure to sign the letter of support for Sutula. Brooks and Parnell cite their criticism of Sutula's relationship with NeuroGenomeX and of the school's decisions to end the MDA grant program, to restrict Brooks from obtaining new grants, and to shut down the MPL. And finally, Sanjak claims that he was laid off because he criticized the school's closings of the MPL and NCRC.

The district court concluded that none of these cited instances touched on a matter of public concern. We agree, though it could have entered summary judgment in favor of the defendants for other reasons. One fundamental problem is that the plaintiffs failed to provide specifics regarding what they said. Instead, they gave only vague descriptions of their speech. We know that they engaged in criticism and "opposed," "expressed concern," "addressed," and "spoke out against" various school decisions. But what exactly did they say? Did they specifically discuss issues of importance to the public? We cannot tell, which is fatal to their claims arising from their criticism of Sutula and of school decisions. There is simply not enough evidence in the record to determine whether they spoke out about matters of public concern. *See Michael*, 259 F.3d at 846-47 (plaintiff failed to

demonstrate retaliation where a vague characterization of what was said was the only evidence of protected speech).

Moreover, even if the plaintiffs' vague descriptions provided enough clues as to what was said, we agree with the district court that the cited instances of speech did not address matters of public concern. The plaintiffs' ongoing dispute with the school was nothing more than an internal personal squabble—the evidence does not suggest that the point of their speech was to raise a matter of public concern rather than to advance their purely private interests. *See Metzger v. DaRosa*, 367 F.3d 699, 702-03 (7th Cir. 2004); *see also Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 587 (7th Cir. 1992) ("[W]here the overriding reason for the speech is the concerns of a few individuals whose careers may be on the line, the speech looks much more like an internal personal dispute than an effort to make the public aware of wrongdoing."). Certainly the public has an interest in treating ALS and MS. But the plaintiffs' objections did not so much center on patient welfare as on the internal operations of the clinics, more specifically, Brooks' ability to operate as he saw fit and the plaintiffs' roles within the clinics. Basically, Brooks objected to the school's decisions to undermine his control over research and export the MPL and NCRC functions elsewhere. This is a classic personnel struggle—infighting for control of a department—which is not a matter of public concern.

Our colleague's dissenting view is well-taken but ultimately unpersuasive. In his view, the plaintiffs' speech centered on the availability of medical care for patients. But the evidence in the record suggests that patient welfare was a mere afterthought. Indeed, the only concrete evidence that the plaintiffs were concerned with patient welfare was a February 2003 e-mail in which Brooks demanded a meeting with DeLuca. In that e-mail, Brooks expressed concerns that the clinical restrictions would have an adverse impact on patient care. But there is no evidence that

patient welfare was ever discussed at the subsequent March meeting, or at any other point in this dispute. Moreover, there is no evidence in the record that the decision to close the labs had any impact whatsoever on patient care. Rather, the tenor of the plaintiffs' concerns centered on how the department should operate, not over the treatment of patients.

The dissent also believes that the plaintiffs' concern over Sutula's involvement with NeuroGenomeX touched on a matter of public concern under *Propst v. Bitzer*, 39 F.3d 148 (7th Cir. 1994). The facts in *Propst* are similar, but the case is distinguishable. In *Propst*, the "public concern" component was not at issue—it was agreed that the plaintiffs' (two laboratory faculty members) allegations that a director misdirected funds touched on a matter of public concern. Here, the "public concern" component is disputed, and for good reason, as the evidence is a far cry from that in *Propst*. All we have here is evidence that Brooks and Parnell expressed concern over a potential conflict of interest regarding Sutula's involvement with NeuroGenomeX. Unlike *Propst*, there was never a specific allegation of misconduct or misusing funds. The dissent says the plaintiffs "accused Sutula of improperly cutting off the MCL's funding in favor of a private venture in which he had a personal financial stake." But that is a mere inference—there is nothing in the record establishing that the plaintiffs made such an allegation.

At heart, this case involved a power struggle over how the department should be run. Because the plaintiffs submitted little more than vague characterizations of their resistance to department reorganization, with little to no evidence of specific commentary on matters of public concern, we believe summary judgment was appropriate.

This leaves only Brooks' refusal to sign the support letter. But even if this constitutes "speech" under the First

Amendment, which the parties assume, the plaintiffs do not demonstrate that the lawsuit or Brooks' defiance implicated a matter of public concern. All plaintiffs say is that he refused to sign off in support of Sutula in a civil lawsuit. But take it from us, not every civil lawsuit involves a matter of public concern. The plaintiffs failed to explain how the litigation impacted the public. The dissent concludes that Brooks' refusal to sign off is per se protected speech because of Sutula's position as a top administrator of a public university. Therefore, so the argument goes, the suit automatically "bore on issues of official misconduct." But we know of no authority for the proposition that every lawsuit involving a department head triggers public interest. Indeed, there is no evidence that the underlying suit involved official misconduct. Rather, the suit arose from the school's failure to follow through on a job offer to a potential associate professor. The plaintiffs offer no basis for concluding that this suit implicated a public concern.

The plaintiffs also challenge the district court's entry of summary judgment in favor of the defendants on their procedural due process claims. To prevail, they must demonstrate (1) that the defendants deprived them of a property interest and (2) that the deprivation occurred without due process of law. *E.g.*, *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004). Here, the district court correctly concluded that Brooks and Parnell failed to establish protected property interests. Brooks did not show that he had a property interest in the continued operation of the MPL, while Parnell did not establish that her new position constituted a demotion under Wis. Stat. § 230.34. And finally, Sanjak did not establish that he was denied adequate process in connection with being laid off; instead, he complained that he was not given a pre-disciplinary proceeding prior to the closing of the MPL. But like Brooks, Sanjak did not have a property interest in the ongoing operation of the MPL.

One final note. The plaintiffs complain that the district court erred by striking portions of affidavits and various exhibits submitted in opposition to the defendants' summary judgment request. But we have examined the stricken evidence, and it would not have changed the outcome.

Accordingly, the judgment of the district court is AFFIRMED.


CUDAHY, *Circuit Judge*, dissenting in part. Although the defendants may very well prevail at some later stage of the analysis (including at the *Pickering* balance between the government's interest as employer and the employee's interest as citizen), the plaintiffs' issues here are matters of concern to a public that relies for its health care on the proper functioning of this public medical school. If these public questions can be cast as mere office complaints, the First Amendment will shrink accordingly, and speech that ought to be protected will be diminished. The *Connick* public concern inquiry, on which this lawsuit was cut short, is preliminary to striking the *Pickering* balance and merely addresses the discrete question whether this protest, viewed in its own light, touched upon matters of concern to the public.[1]

---

[1] Of course, the majority has framed the basic First Amendment retaliation test correctly: In order "[t]o determine whether speech is constitutionally protected, we engage in a familiar two-part inquiry traditionally known as the *Connick-Pickering* test." *Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004) (citing *Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999); *Connick v. Myers*,

(continued...)

We have previously concluded that "[i]n broad general terms, of course, educational improvement and fiscal responsibility in public schools clearly are matters of public concern." *Klug v. Chicago School Reform Bd. of Trustees*, 197 F.3d 853, 858 (7th Cir. 1999). This is especially so where some malfeasance or misuse of school funds is at issue. *See Propst v. Bitzer*, 39 F.3d 148, 152 (7th Cir. 1994) *cert. denied*, 514 U.S. 1036 (1995) (holding that allegations of malfeasance and mismanagement in a university research lab touched upon matters of public concern); *Berg v. Hunter*, 854 F.2d 238, 243 (7th Cir. 1988) (holding that intramural athletic coordinator's accusation that school official had misrepresented the extent of school salary increases during a period of budget deficits touches on matters of public concern.).

Of course, finances need not even be the subject when charges of official misconduct in school affairs ought to be of concern to the public. We have held that speech involving other serious misconduct by school officials will fill the bill, including speech alleging academic misconduct by faculty members, *Feldman v. Ho*, 171 F.3d 494, 496 (7th Cir. 1999), inappropriate sexual requests made by faculty members to students, *Webb v. Board of Trustees of Ball State University*, 167 F.3d 1146, 1150 (7th Cir. 1999), and potential child abuse by a teacher, *Cromley v. Board of Education of Lockport Township High School District 205*, 17 F.3d 1059, 1067 (7th Cir. 1994).

---

[1] (...continued)
461 U.S. 138 (1983); *Pickering v. Bd. of Education*, 391 U.S. 563 (1968)). "Under *Connick*, we must determine whether the speech addressed a matter of public concern. If the speech did involve such a concern, under the *Pickering* balancing test, we then must determine whether the government's interest as an employer in providing effective and efficient services outweighs the employee's interest as a citizen in commenting upon the matter of public concern." *Id.* at 698. "The determination of whether the speech is constitutionally protected is a question of law for the court." *Id.*.

Even in the absence of affirmative misconduct, speech on general matters of school policy can implicate matters of public concern, so long as they affect the public. Speech in this category may include contacting student athletes to persuade them that the school mascot degrades minority groups, *Crue v. Aiken*, 370 F.3d 668, 678 (7th Cir. 2004), providing information to the media about the school board's alleged violation of a local open-meetings law, *Dishnow v. School District of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996), writing a memorandum criticizing school grading policy, *Hesse v. Board of Education of Township High School District No. 211*, 848 F.2d 748, 751-52 (7th Cir. 1988), and giving a speech to the school board concerning inequitable mileage allowances for school coaches, the extent of the school's liability insurance and school grievance procedures, *Knapp v. Whitaker*, 757 F.2d 827, 840-42 (7th Cir.) *cert. denied*, 474 U.S. 803 (1985).

Plaintiffs' speech here clearly relates to a matter of public concern. First, plaintiffs' refusal to sign the petition in support of defendant Sutula is expressive activity protected by the First Amendment,[2] and since the petition concerned a lawsuit against Sutula—a top administrator of a public university medical school—it bore on issues of official misconduct. But even setting aside plaintiff Brooks' refusal to sign the petition, it is undisputed that plaintiffs also expressed specific concerns, in meetings with medical school administrators between 2001 and 2003, over cuts in the

---

[2] The Supreme Court has previously held that the First Amendment protects one's right to *refrain* from speaking no less than one's right to engage in proactive expressive conduct. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (holding that an individual's right to abstain from reciting the Pledge of Allegiance is protected by the First Amendment). A citizen's prerogative to remain silent on an issue of public concern presumptively comes within the ambit of the First Amendment.

MPL's funding and Sutula's alleged personal financial interests in a private venture that competes with the MPL for grant money.[3]

In February, 2003, Brooks demanded a meeting with Paul DeLuca, Associate Dean for Research and Graduate Studies,[4] to address what he perceived to be unwarranted attacks on his clinical research and the resulting adverse effects on patient care. Brooks, together with plaintiff Parnell, met with DeLuca on March 20, 2003, and he spoke with DeLuca about the restrictions on his funding, the perceived attacks against his research by Chairman Sutula and the financial prospects of the NCRC and the MPL. There is also evidence that he raised concerns about Sutula's involvement in NeuroGenomeX, a private venture which competed with the NCRC and MPL for funding, though this point is disputed. At the meeting, Brooks also gave DeLuca a power point presentation which contained information on NeuroGenomeX, and DeLuca subsequently forwarded the presentation to Sutula. The day after this meeting, DeLuca

---

[3] Both this court and the Supreme Court have held that speech does not lose its protected character simply because it is expressed privately. *See Connick*, 461 U.S. at 146 ("First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly."); *Arnett v. Kennedy*, 416 U.S. 134 (1974) ("Speech is still speech—and still protected—even if it is made privately."); *Marquez v. Turnock*, 967 F.2d 1175, 1178 (7th Cir. 1992). ("Nor should it make any difference that most of Marquez's statements were made to other persons within the Department, rather than to the general public.").

[4] This court has indicated that where, as here, plaintiff's "communication was directed to individuals with significant influence in the Department," this fact suggests that plaintiff did "seek to bring to light actual or potential wrongdoings or breach of public trust." *Marquez*, 967 F.2d at 1178 (quotation omitted).

e-mailed Sutula to describe Parnell's objections to the actions taken against Brooks' research team and to inform Sutula that Brooks had complained to the Dean about restriction on his grant privileges. In the e-mail, DeLuca recommended conducting a full investigation of these issues and suggested that he and Sutula might need legal representation in the upcoming fight over the research strictures.

As later restrictions on the MPL and NCRC were implemented, plaintiff Sanjak filed a formal grievance with the University opposing the closure of the MPL. Plaintiff Parnell also asserted that in the spring or summer of 2003 she went public by speaking to television reporter Tony Galle on multiple occasions regarding the administration's attacks on the MPL and the NCRC, and plaintiffs allege that DeLuca held a press conference with the local news media to address these issues. These communications remove any question about the public character of the dispute.

We need go no farther than *Propst v. Bitzer*, 39 F.3d 148 (7th Cir.) *cert. denied* 514 U.S. 1036 (1995), to find a case very close to this one. There two university researchers alleged to university officials that the director of their laboratory had "diverted university resources to benefit himself and private companies that he controlled, and that he had failed to document various expenditures as required under university regulations." *Id.* at 150. Our court determined that these allegations related to matter of public concern, explaining that "[a]long with other courts, we have recognized the importance of an employee's interest in pointing out a misuse of public funds or other breach of public trust . . . . [s]peech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." *Id.* at 152 (internal citations and quotation marks omitted). The allegations advanced by the plaintiffs in *Propst* are very similar to those made by Brooks, Parnell and Sanjak in the instant case—they accused Sutula of improperly cutting off

the MCL's funding in favor of a private venture in which he
has a personal financial stake. The claim here is a classic
accusation of malfeasance and abuse of public trust like the
one addressed in *Propst*.

The fact that the plaintiffs have a personal interest in
preserving a substantial treatment facility for patients with
neurological diseases (the MPL) and in an important
neurological research and patient care program (the NCRC),
is not a basis to deny that the maintenance of these facili-
ties and programs are matters of clear concern to the public.
A personal motive reinforcing a plea to preserve medical
research and treatment activities that serve patients and
contribute research at a publicly-supported medical school
detracts nothing from the public character of these activi-
ties. *See Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir.
2000) ("[a] personal aspect contained within the motive of
the speaker does not necessarily remove the speech from
the scope of public concern.") (quotation marks omitted).
And the issue here is whether these programs and activities
are for the most part to be put out of existence not, as the
majority suggests, whether they will simply not continue
under the control of the plaintiffs.

In these respects, this case brings sharply to mind
*Pickering v. Board of Education*, 391 U.S. 563 (1968), the
very font of First Amendment law involving protests of
public employees affecting matters of their employment. In
*Pickering*, a teacher in a public high school protested against
the re-allocation of public funds from academic programs,
where the teacher was apparently involved, to athletic
activities, where he was not. Obviously, the teacher had a
personal interest in the allocation of funds, but this did not
detract from the public importance of his protest.

In sum, plaintiffs' allegations bear a striking resemblance
to those deemed to be of public concern in *Propst, supra,* and
they certainly relate to issues that might directly impact

the taxpaying public—i.e., conflicts of interest and mismanagement in the administration of a public university medical center involving the level of public funding available for certain types of medical research and the availability of medical care for certain neurological disorders. Alleged conflicts of interest and cuts in funding for medical research and patient care at a publicly funded medical school are, to quote *Connick*, matters "of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." 461 U.S. at 149. "Whether public officials are operating the government ethically and legally is a quintessential issue of public concern." *Greer v. Amesqua*, 212 F.3d at 371.

As indicated, this lawsuit may well fail at a later stage of analysis when the inquiry focuses on whether the actions of the defendants were justified in the face of the plaintiffs' protest. But the subject of the protest—the conduct of research and patient care at the medical school of a public university—is surely a matter of public concern, as well as a matter of personal concern to the plaintiffs.

I therefore respectfully dissent.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*